UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CISCO SYSTEMS, INC.,

               Plaintiff,

     -v-                              No.  20-CV-10879-LTS-SN

SYNAMEDIA LTD F/K/A TRITON UK
BIDCO LIMITED,

               Defendant.

-------------------------------------------------------x

### Memorandum Order

        Plaintiff Cisco Systems, Inc. ("Cisco") brings this action asserting claims for breach and anticipatory breach of contract, and for declaratory judgment, against Synamedia Ltd f/k/a Triton UK Bidco Limited ("Synamedia").  The claims arise principally out of Synamedia's alleged breaches of a Purchase Agreement into which the parties entered on April 30, 2018.  (See docket entry no. 27 ("Compl."); docket entry no. 27-1 ("Purchase Ag.").)

        Before the Court are Synamedia's motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (docket entry no. 13), Synamedia's letter-motion to seal certain papers filed in support of that motion (docket entry no. 23), and Cisco's letter-motion to seal certain papers filed in opposition to that motion (docket entry no. 28).  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. section 1332.  The Court has reviewed the parties' submissions thoroughly,[1] and, for the following reasons, Synamedia's motion to dismiss is granted in part and denied in part, Synamedia's letter-motion to seal is granted in part and denied in part, and Cisco's letter-motion to seal is denied in its entirety.

---

[1]     The Court has considered Synamedia's request for oral argument and finds that oral argument is not necessary.

<u>BACKGROUND</u>

The following facts, which are alleged in the Complaint or drawn from documents integral to the Complaint, are taken as true for purposes of Synamedia's motion to dismiss.  On April 30, 2018, the parties entered into the Purchase Agreement, whereby Cisco "sold to Synamedia certain contractually defined assets and Synamedia assumed certain contractually defined assumed liabilities."  (Compl. ¶ 2.)[2]  Among those assets were certain "to be assigned contracts," including a lease for "a property located in the Borough of Eastleigh in Hampshire, England, known as Chandlers Ford 2" (the "Lease").  (<u>Id.</u> ¶¶ 3, 19-20 & Ex. D.)  Under that Lease—which was entered into in 2001 and has a 25-year term—the landlord's consent "is required before the Lease can be formally assigned to (and assumed by)" a third party such as Synamedia.  (<u>Id.</u> ¶¶ 4, 23 & Ex. D at 10, 52.)

Section 1.5 of the Purchase Agreement (titled "Approvals and Consents") addressed the parties' treatment of contracts, such as the Chandlers Ford 2 Lease, as to which a third party's consent was required prior to any formal transfer from Cisco to Synamedia.  Three subsections of Section 1.5 are of particular relevance to Synamedia's motion to dismiss.  First, Section 1.5(a) defined such contracts as "Restricted Assets":

> **(a)** Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to sell, convey, transfer, assign or deliver (a "***Transfer***") to Buyer any Contract constituting an Assigned Contract, or any claim, right or benefit arising under or resulting from such Assigned Contract if and for so long as (i) the Transfer or attempted Transfer to Buyer thereof, without the Consent of a third party, under applicable Law or the express terms of the applicable Assigned Contract, would constitute a breach of or other contravention of the rights under such Assigned Contract and (ii) the Consent for such Transfer is not obtained prior to the Closing (such Contract, together with any claim, right

---

2        The relevant parties to certain of the assets and liabilities were Cisco subsidiaries, rather than Cisco itself.  (<u>See</u> Compl. ¶ 3.)  For purposes of this Memorandum Order, the Court's references to Cisco and Synamedia include their relevant respective subsidiaries.

or benefit arising thereunder, being collectively referred to herein as "***Restricted Assets***").[³] Notwithstanding anything in this Agreement to the contrary, unless and until any such Consent with respect to any Restricted Asset or Restricted Split Interest (as defined in <u>Section 1.5(c)</u>, below), as appropriate, is obtained or the applicable restriction or impediment on Transfer or splitting ceases to exist (such time, the "***Consent Receipt Time***"), neither such Restricted Asset nor such Restricted Split Interest shall constitute a Purchased Asset; provided that at no time on or after the Closing shall any Restricted Assets or Restricted Split Interest for which the Consent Receipt Time has not occurred constitute Excluded Assets nor shall any Liability arising out of, or related to, such Restricted Assets or Restricted Split Interest constitute an Excluded Liability solely by virtue of being a Restricted Asset or Restricted Split interest, in each case, for purposes of Seller's indemnification obligations under <u>ARTICLE VIII</u>. Once Consent to Transfer a Restricted Asset or Restricted Split Interest is obtained, Seller shall, or shall cause its Subsidiaries to Transfer the relevant Restricted Asset or Restricted Split Interest to which such Consent relates to Buyer for no additional consideration. . . .

(Purchase Ag. § 1.5(a) (emphasis in original).)  Section 1.5(d) addressed the parties' treatment of

"Restricted Assets" in the event the relevant required consent was not secured on or prior to the

Closing Date:

**(d)** If any required Consent to Transfer a Restricted Asset or a Restricted Split Interest is not obtained on or prior to the Closing Date, the Parties hereby agree to use commercially reasonable efforts to implement or give effect to such arrangements (including subleasing, sublicensing or subcontracting) with respect to the underlying rights and obligations, benefits and burdens related thereto, to the extent practicable and/or permitted by applicable Law, for (i) Buyer or other Buyer, as the case may be, to perform and be responsible for (and Buyer or other Buyer, as the case may be, shall agree to perform and be responsible for) the Liabilities of Seller or any applicable Subsidiary of Seller after the Closing Date thereunder (to the extent they would otherwise constitute Assumed Liabilities had such required Consent been obtained on or prior to the Closing Date), and for Buyer or other Buyer, as the case may be, to assume the Liabilities thereof (the "***Subcontracted Restricted Asset Work***"), (ii) Buyer or other Buyer, as the case may be, to be provided all corresponding rights, benefits and payments thereunder arising or made after the Closing Date, and (iii) Seller to enforce at the Buyer's or other Buyer's, as the case may be, sole cost and expense and at the reasonable request of and for the benefit of Buyer or other Buyer, as the case may be,

---

³       "The parties closed on the Purchase Agreement on October 28, 2018."  (Compl. ¶ 18.)

, [sic] any and all claims, rights and benefits of Seller and/or any applicable Affiliate of Seller, to the extent related to the Subcontracted Restricted Asset Work, against any third party thereto arising from any such Restricted Asset or Restricted Split Interest, in each case until the earlier of (x) such time as such Consent to Transfer the applicable Restricted Asset or Restricted Split Interest shall have been obtained and such Transfer shall have taken place and (y) in the case of a Restricted Asset that is a Contract or a Restricted Split Interest, such time as such Contract or Restricted Split Interest shall have lapsed, terminated, expired or not have been renewed in accordance with its terms.

(Id. § 1.5(d) (emphasis in original).)  In pertinent part, Section 1.5(d) thus provided that the parties agreed to "use commercially reasonable efforts to implement or give effect to such arrangements (including subleasing, sublicensing or subcontracting)" for Synamedia to "perform and be responsible for" Cisco's liabilities as to each Restricted Asset, until (x) the parties obtained the required consent, or (y) the expiration of the term of the Restricted Asset.

Section 1.5(e) further addressed the parties' treatment of the "Subcontracted Restricted Asset Work" defined in Section 1.5(d):

**(e)** For Subcontracted Restricted Asset Work related to Contracts with customers of the Business, the parties agree that the arrangements referenced in the next sentence will be addressed primarily by adding such Contracts to the list of Contracts to be managed pursuant to the Services Agreement and, to the extent required to perform under such Contracts under the Services Agreement, the Transition Services Agreement and that the terms and conditions of the Services Agreement and the Transition Services Agreement, as applicable, will apply to such Subcontracted Restricted Asset Work.  Buyer agrees to perform and discharge, or cause its Subsidiaries to perform and discharge, and shall be responsible for, all Liabilities of Seller and its Subsidiaries in connection with any Restricted Split Interest and/or the Subcontracted Restricted Asset Work, directly or indirectly, as applicable, and in that regard Buyer will, in accordance with the underlying Contracts, (A) bear the sole responsibility for completion of the work or provision of goods and services, (B) be solely responsible for any warranties, contractual commitments or other Liabilities thereunder or any breach thereof, any repurchase, indemnity and service obligations thereof, and any maintenance and support obligations thereof, and (C) promptly reimburse the reasonable costs and expenses of Seller and Affiliates related thereto (including any costs of defending claims that result from the failure of Buyer and its Affiliates to perform and discharge such obligations) . . . Seller agrees to comply with Sections 1.5(d)(ii) and

(iii) in connection with the Subcontracted Restricted Asset Work. To the extent that a Consent to Transfer to Buyer or Other Buyer, as the case may be, with respect to a particular Restricted Asset or Restricted Split Interest is obtained after the Closing Date, the Parties agree that upon the receipt of such Consent (I) such assets shall be considered properly Purchased Assets for all purposes of this Agreement and (II) such obligations will no longer be considered to be Subcontracted Restricted Asset Work, but will instead be deemed to be Assumed Liabilities for all purposes of this Agreement. The Parties shall enter into such reasonable arrangements with respect to Continuing Employees performing services under any Restricted Asset or Restricted Split Interest as are necessary and appropriate to give effect to the arrangements provided for under this <u>Section 1.5(e)</u>.

(Purchase Ag. § 1.5(e) (emphasis in original).)

In connection with the parties' entry into the Purchase Agreement, they entered into several ancillary agreements, including a Transition Services Agreement. (Docket entry no. 17 ("Parrott Decl.") Ex. 1 (the "TSA").)[4] The TSA, "pursuant to which" Cisco was to "cause certain services to be provided" to Synamedia "in connection with the transition of the Business" to Synamedia (Purchase Ag. at 1), enumerated those services (the "Transition Services") and set forth the time periods during which the services would be provided (the "Transition Periods"). (TSA § 1.1(a).) It also provided for the possibility of an extension of such Transition Periods, in some cases triggering Synamedia's obligation to pay related surcharges:

---

[4]     Cisco's Complaint includes a copy of the Purchase Agreement (without the exhibits thereto) but does not reference or attach the TSA. Synamedia submitted a copy of the TSA in connection with Synamedia's motion to dismiss. The TSA is an enumerated exhibit to (and is referenced throughout) the Purchase Agreement (see <u>id.</u> at p. iv, 1, 3, 5, 12, 15, 22, 25, 30, 60, 81, 83, 94), and may therefore properly be considered by the Court without converting Synamedia's motion to dismiss into one for summary judgment. <u>See</u> <u>Verzani v. Costco Wholesale Corp.</u>, 641 F. Supp. 2d 291, 297-98 (S.D.N.Y. 2009) ("[W]here the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim."), <u>on reconsideration</u> (Aug. 6, 2009), <u>aff'd</u>, 387 F. App'x 50 (2d Cir. 2010); <u>Barnum v. Millbrook Care Ltd. P'ship</u>, 850 F. Supp. 1227, 1230 n.2 (S.D.N.Y. 1994) ("The [parties'] Agreement was partially incorporated in [the] Amended Complaint. [ ]. However, the entire Agreement has been submitted by the Defendants, [ ], and may be duly considered by the Court upon a motion to dismiss.") (citations omitted), <u>aff'd</u>, 43 F.3d 1458 (2d Cir. 1994).

> 3.3 Extensions; Surcharges. Service Provider will have no obligation to provide any Transition Services beyond the expiration of the applicable Transition Period, except (a) where Service Recipient reasonably expects that it cannot migrate from the Transition Service prior to the expiration of the Transition Period and Service Recipient provides Service Provider notice of its election of an additional three month period for the provision of such Transition Services (such period, an "***Extension Period***") and (b) as required by Section 1.5(e), of the Purchase Agreement. Service Recipient agrees to pay Service Provider a surcharge, for any Extension Period, in addition to the fees set forth in the applicable Exhibit for the Transition Service (the "***Surcharge***"). The Surcharge shall be equal to 35% of the fees for the applicable Transition Service during the initial three month period of any such extension and 45% of the fees for any extension granted thereafter. . . . For clarity, no Surcharge is payable to the extent a Transition Period for [sic] is required to be extended by Section 1.5(e) of the Purchase Agreement.

(Id. § 3.3 (emphasis in original).)  The TSA also contained a provision authorizing Synamedia to "terminate or reduce its requirement for any or all Transition Service(s), or portion thereof, upon 30 days' written notice" to Cisco.  (Id. § 4.3.)

Exhibit A to the TSA detailed the specific Transition Services Cisco would arrange to provide, and the specific Transition Periods applicable to those services, as to specific contracts, including the Chandlers Ford 2 Lease.  As to that Lease, the TSA provided that Cisco would provide the following services:

> • Service Provider will provide physical access and exclusive use of the 3,830 square foot lab currently used by the Business located at this property and non-exclusive people space in this 29,500 square foot building.
>
> • Restricted access badge will be provided to Facilities Users located in Chandlers Ford 1&2 buildings of the Specified Premise in Chandler's Ford during the term of the applicable Transition Service.
>
> • Facilities Users will be required to submit Service Provider background checks and sign Service Provider confidentiality agreements in order to be provisioned with Service Provider restricted access badges.
>
> • Service Provider will also offer the following provided at the current service level for this site during the Transition Period: Employee Services, facilities management, safety and security, and cafe services.

(Id. Ex. A, Schd. 3 at 25-26.)  Schedule 3 of Exhibit A of the TSA defined the "Transition Period" for "Specified Premises" (with certain exceptions), including the Chandlers Ford 2 Lease, as 18 months (id. at 10-11), although under a separate column of "Dependencies/Assumptions/Special Conditions," the same Schedule provided that, for a smaller subset of "***Transitioning to Service Recipient (leased)*** site type[s]," also including the Chandlers Ford 2 Lease, "these Facilities Services will be in effect until the applicable lease transitions to the Service Recipient."  (Id. at 12 (emphasis in original).)

Finally, the parties' Purchase Agreement provided that, "[i]n the event of any inconsistency between the provisions of this Agreement and any other Transaction Document," such as the TSA, "the provisions of this Agreement shall prevail."  (Purchase Ag. § 10.11.)

After the Purchase Agreement's Closing Date, Synamedia "began enjoying the benefits of the Lease by using equipment and personnel [ ] at the Chandlers Ford 2 premises." (Compl. ¶ 35.)  Synamedia also "began paying Cisco for rent and other expenses in connection with the Lease."  (Id. ¶ 36.)  Meanwhile, the parties attempted to secure a surrender and grant of the Lease from Cisco to Synamedia.  (Id. ¶¶ 37-38.)  In November 2019, Synamedia invoked a section of the Purchase Agreement requiring Cisco (under certain circumstances) to use "commercially reasonable efforts" to "promptly procure an assignment of the whole of Chandlers Ford Lease 2 (in accordance with its obligations already set out in Section 1.1 and Section 1.5 of the Purchase Agreement)" to Synamedia.  (Purchase Ag. § 5.30(c)(vi) (as amended); Compl. ¶¶ 33, 42.)  Cisco made such efforts (Compl. ¶¶ 43-44), but "Synamedia rejected every proposed assignment."  (Id. ¶ 44.)

In the summer of 2020, Synamedia "completed a sublease for a nearby property known as Chandlers Ford 1" and moved out of Chandlers Ford 2.  (Compl. ¶¶ 45-48.)

Synamedia also stopped paying Cisco the Lease payments and related expenses it had been paying since the Closing Date, and took the position that, "once it completely vacated Chandlers Ford 2, it would no longer be liable for any liabilities or obligations in connection with the Lease." (Id. ¶¶ 47, 52.)

As far as the parties have reported, the landlord of Chandlers Ford 2 has not consented to any assignment or other formal transfer of the Lease from Cisco to Synamedia.

Cisco filed its Complaint on December 23, 2020, alleging principally that Section 1.5 of the Purchase Agreement rendered Synamedia "responsible for all [of Cisco's] liabilities and obligations in connection with the Lease at the Closing Date . . . through the end of the Lease" (Compl. ¶ 31), and that Synamedia breached the Purchase Agreement when it stopped performing and discharging those liabilities and obligations beginning in the summer of 2020. (Id. ¶¶ 54-68.)

## DISCUSSION

### Synamedia's Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true the nonconclusory factual allegations in the complaint and draws all reasonable inferences in the nonmoving party's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

On a motion to dismiss a breach of contract claim, the Court must "resolve any contractual ambiguities in favor of the plaintiff." Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie, 784 F.3d 78, 86 (2d Cir. 2015) (quoting Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005)). "A contract term is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" Orlander v. Staples, Inc., 802 F.3d 289, 294-95 (2d Cir. 2015) (quoting Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012)). "'[W]ords and phrases . . . should be given their plain meaning' and a 'contract should be construed so as to give full meaning and effect to all of its provisions.'" Orlander, 802 F.3d at 295 (quoting Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003)); Accord Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., 957 F.3d 337, 346 (2d Cir. 2020) ("A reading of the contract should not render any portion meaningless." (citation omitted)). "[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004).

Synamedia moves to dismiss each of Cisco's three causes of action, for breach of contract, anticipatory breach, and declaratory judgment.

Synamedia first moves to dismiss Count I of the Complaint, for breach of contract, on the ground that Synamedia had no obligation, under the Purchase Agreement, to perform and be responsible for Cisco's obligations and liabilities under the Lease after the expiration of the TSA in or about August 2020. (Docket entry no. 15 ("Synamedia Mem.") at 13-19; docket entry no. 33 ("Reply") at 3-10.)[5] According to Synamedia's reading of the

---

[5]     "Under New York law, the elements for breach of contract are '(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to

Purchase Agreement, Synamedia agreed only "to use commercially reasonable **efforts** to implement or give effect to such arrangements (including subleasing, sublicensing or subcontracting) with respect to the underlying rights and obligations, benefits and burdens related thereto," for Synamedia to "perform and be responsible for" and to "assume the Liabilities" of Restricted Assets such as the Chandlers Ford 2 Lease (Purchase Ag. § 1.5(d) (emphasis supplied)), and that the parties **actually** gave effect to "such arrangements" with respect to the Chandlers Ford 2 Lease through—and only through—the TSA.  (See Reply at 1 ("Synamedia's rights and obligations as to the Chandlers Ford 2 Lease were created and governed by the TSA.").)  Therefore, Synamedia argues, after the TSA's expiration in the summer of 2020, Synamedia had no further obligations as to the Lease.

The Court concludes, for the following reasons, that Cisco has plausibly alleged that the parties' Purchase Agreement rendered Synamedia responsible for the performance and reimbursement of Cisco's liabilities under the Lease even after the expiration of the TSA.  In Section 1.5(d) of the Purchase Agreement, the parties agreed to use commercially reasonable efforts to "implement or give effect to" (including through "subleasing, sublicensing or subcontracting") Synamedia's responsibility for and assumption of the liabilities of Cisco as to

---

perform; and (iv) damages.'" Stralia Mar. S.A. v. Praxis Energy Agents DMCC, 431 F. Supp. 3d 366, 373 (S.D.N.Y. 2019) (quoting Orlander, 802 F.3d at 294).  In a footnote, Synamedia argues that Cisco has not adequately alleged its own performance of its obligation, under the Purchase Agreement, to use "commercially reasonable efforts" to arrange for a grant, surrender, or assignment of the Lease to Synamedia.  (Synamedia Mem. at 13 n.7.)  "But a party may not raise an argument in a footnote alone."  City of Philadelphia v. Bank of Am. Corp., 498 F. Supp. 3d 516, 537 (S.D.N.Y. 2020); accord Weslowski v. Zugibe, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them."), aff'd, 626 F. App'x 20 (2d Cir. 2015).  Moreover, given Cisco's allegations that it made several efforts to arrange for such a grant, surrender, or assignment (see docket entry no. 30 ("Opp.") at 13 n.2), the question of whether those efforts were "commercially reasonable" is an issue ill-suited to resolution on this motion to dismiss.

Restricted Assets such as the Chandlers Ford 2 Lease, until the earlier of the landlord's consent

to an assignment or other formal transfer of the Lease, or until the Lease "shall have lapsed,

terminated, expired or not have been renewed in accordance with its terms."  Section 1.5(d) itself

imposed no other time limitation on the parties' obligations under that Section.  Furthermore,

Section 1.5(d)'s reference to implementation or giving effect through subleasing, sublicensing or

similar arrangements did not explicitly require separate agreements to create a liability on

Synamedia's part to cover Cisco's Lease obligations.  In Section 1.5(e), moreover, Synamedia

agreed to "perform and discharge" and to "be responsible for" Cisco's liabilities in connection

with the Subcontracted Restricted Asset Work (as defined in Section 1.5(d)[6]), "directly or

indirectly," and to "promptly reimburse the reasonable costs and expenses" of Cisco "related

thereto[.]"  Section 1.5(e) further provided that, in the event the outstanding third-party consent

with respect to a particular Restricted Asset "is obtained after the Closing Date," obligations as

to that asset would "no longer be considered to be Subcontracted Restricted Asset Work," but

would become "Assumed Liabilities for all purposes"; it imposed no time limitation upon that

future possibility.  Cisco's allegation that the Purchase Agreement imposed on Synamedia an

obligation to perform and be responsible for Cisco's liabilities under the Lease even after the

expiration of the TSA is thus supported by a plausible reading of the language of the Purchase

Agreement.[7]

---

[6]     Section 1.5(d) defines the "Subcontracted Restricted Asset Work" to refer to "the
Liabilities of Seller or any applicable Subsidiary of Seller after the Closing Date
thereunder (to the extent they would otherwise constitute Assumed Liabilities had such
required Consent been obtained on or prior to the Closing Date)."  Synamedia does not
concede that "Subcontracted Restricted Asset Work" includes Cisco's liabilities under the
Chandlers Ford 2 Lease (Synamedia Mem. at 16; Reply at 5-6), but it proposes no
alternative definition of that term.

[7]     Synamedia argues that Cisco's proffered reading of Section 1.5(e)—as requiring
Synamedia's performance and discharge of Cisco's liabilities as to the Restricted

Furthermore, the terms of the TSA do not render implausible Cisco's breach of contract claim.  To be sure, the TSA's enumeration of "physical access" to Chandlers Ford 2 as one "Transition Service" (among others) that Cisco would provide Synamedia during the term of the TSA may be in some tension with Section 1.5(d) of the Purchase Agreement, in which the parties agreed to use commercially reasonable efforts for Synamedia "to be provided all corresponding rights" as to Restricted Assets such as the Chandlers Ford 2 Lease.  But if the parties intended for Section 1.5(d) to take effect only through, or be otherwise limited by, the Transition Services enumerated in the TSA, they could have referenced the TSA explicitly in Section 1.5(d)—as they did in several other provisions of the Purchase Agreement—or cross-referenced Section 1.5(d) in the relevant provisions of TSA.[8]  Moreover, even if Cisco's reading

---

Assets—renders superfluous Section 1.5(d)'s requirement that the parties use "commercially reasonable efforts to implement or give effect to such arrangements (including subleasing, sublicensing or subcontracting)," to reach the same end.  (See Synamedia Mem. at 18.)  However, an additional obligation to use commercially reasonable efforts to formalize (through subleasing, sublicensing, or subcontracting arrangements) Synamedia's assumption of Cisco's liabilities as to the Restricted Assets is not necessarily inconsistent with Synamedia's assumption of those liabilities whether or not the parties succeed in their efforts to enter into such formal arrangements.  Moreover, even if Cisco's reading of Section 1.5(e) were flawed, the Court would still conclude that Cisco has stated a plausible claim that Synamedia breached its obligation under Section 1.5(d) to "use commercially reasonable efforts" to make arrangements to perform and discharge Cisco's obligations as to the Lease after the expiration of the TSA, in light of Synamedia's alleged entry into, and performance of, arrangements for occupancy of other premises.

[8]   Synamedia also argues that Cisco's behavior may suggest that it understood Synamedia's payments in satisfaction of the Lease prior to the summer to 2020 to be made pursuant not to Section 1.5 of the Purchase Agreement, but instead pursuant to the TSA, which imposed surcharges on Synamedia during periods in which the Transition Services set forth in the TSA were extended beyond that agreement's initial term—except when such extensions were "required . . . by Section 1.5(e) of the Purchase Agreement."  (TSA § 3.3.)  Specifically, on reply, Synamedia writes that "Cisco does not (and indeed cannot) argue that it did not also charge Synamedia surcharges under the TSA for Cisco's pass-through rent obligations" (Reply at 10 n.10), suggesting that Cisco may have considered those rent obligations due under the TSA, rather than Section 1.5(e) of the Purchase Agreement.  The Court declines to rely on this factual assertion by Synamedia in its reply

of Section 1.5(d) might risk rendering superfluous the TSA's inclusion of "physical access" to

Chandlers Ford 2 as a "Transition Service," Synamedia's own preferred reading of the TSA as

encapsulating any and all of Synamedia's obligations under Section 1.5(d) risks rendering

superfluous that Section's provision that it would be in effect "until the earlier of" either landlord

consent to a formal transfer of the Lease, or "such time as such Contract [ ] shall have lapsed,

terminated, expired or not have been renewed in accordance with its terms." (Purchase Ag. §

1.5(d).)  This tension might be resolved by reference to the Purchase Agreement's inconsistency

clause.  (Id. § 10.11 ("In the event of any inconsistency between the provisions of this

Agreement and any other Transaction Document, the provisions of this Agreement shall

prevail.")).  In any event, dismissal of Cisco's claim for breach of contract is not warranted at

this stage.

The Court therefore denies Synamedia's motion insofar as it seeks the dismissal

of Count I of the Complaint.

Synamedia next argues that Counts II and III of the Complaint—for anticipatory

breach of contract and declaratory judgment, respectively— should be dismissed because those

claims are "based on the same allegations and legal theory" as Cisco's breach of contract claim,

and therefore fail for the same reasons.  (Synamedia Mem. at 19-21.)  Having concluded that

Cisco has plausibly stated a claim for breach of contract, the Court denies Synamedia's motion to

dismiss Counts II and III of the Complaint for the reasons set forth above.

Synamedia also argues that Count III of the Complaint—for declaratory

judgment—should be dismissed because "a declaratory judgment is a form of relief, not an

---

brief at the Rule 12(b)(6) phase.  Fonte v. Bd. of Managers of Cont'l Towers Condo., 848
F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda
are [ ] treated as matters outside the pleading for purposes of Rule 12(b).").

independent cause of action." (Synamedia Mem. at 20-21.) On this point, Synamedia is correct. A request for relief in the form of a declaratory judgment does not constitute an independent cause of action. In re Joint Eastern and Southern Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993). The Court therefore dismisses Count III to the extent that it is pled as a standalone declaratory judgment cause of action, and construes that cause of action instead as a request for declaratory relief in connection with Counts I and II of the Complaint. See, e.g., Travis v. Navient Corp., 460 F. Supp. 3d 269, 286 (E.D.N.Y. 2020) (construing declaratory judgment cause of action "as a request for declaratory relief, not a separate cause of action").

Letter-Motions to Seal

Cisco and Synamedia each filed a letter-motion to seal certain submissions in connection with Synamedia's motion to dismiss. (Docket entry nos. 23, 28.) Both letter-motions are on consent.

The public has a "general right to inspect and copy public records and documents, including judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978) (footnotes omitted). "Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." Newsday LLC v. Cty. of Nassau, 730 F.3d 156, 163 (2d Cir. 2013). The weight given to the presumption of public access is determined by "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995). Once determined, the weight of the presumption is balanced against competing interests, which "include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of

those resisting disclosure.'" Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006) (quoting Amodeo, 71 F.3d at 1049).

"Just as with documents submitted in connection with a Motion for Summary Judgment, documents filed in connection" with a motion to dismiss are "'judicial documents to which a presumption of immediate public access attaches under both the common law and the First Amendment.'" Bernsten v. O'Reilly, 307 F. Supp. 3d 161, 166 (S.D.N.Y. 2018) (quoting Lugosch, 435 F.3d at 126). That presumptive right to public observation is "at its apogee" when asserted with respect to documents directly affecting the Court's adjudication. Id. (quoting Gambale v. Deutsche Bank AG, 377 F.3d 133, 140 (2d Cir. 2004)).

In this case, the parties seek to file under seal the entire TSA, as well the unredacted versions of their principal memoranda of law, with corresponding public versions redacting those memoranda's references to certain portions of the Complaint, the Purchase Agreement, the TSA, and the parties' pre-suit negotiations. The parties proffer as bases for their sealing requests (1) Judge Broderick's Order dated December 23, 2020 (docket entry no. 3), which permitted temporary sealing of Plaintiff's Complaint with exhibits, subject to a requirement that, once Synamedia had appeared in this action, the parties meet and confer "concerning whether or not redactions to the sealed documents can be made," (2) the Confidentiality Agreement incorporated into the parties' Purchase Agreement, and (3) Cisco's proffer that certain terms of the parties' agreements reveal Cisco's "proprietary and business sensitive information," "sensitive pricing information or how Cisco structures the sales of assets in a divestiture," or "confidential discussions between Cisco and Synamedia to obtain a grant of lease or alternatively, an assignment of the Lease to Synamedia." (Docket entry no. 28; see also docket entry no. 25 ("Gorman Decl.").)

The parties have not overcome the strong presumption of public access which attaches to their principal memoranda of law filed in connection with Synamedia's motion to dismiss. Judge Broderick's December 23, 2020, Order did not authorize a blanket sealing of Cisco's Complaint and its exhibits for the remainder of this case—instead, it explicitly contemplated that the parties and Court would reconsider such sealing, after Synamedia had appeared. Indeed, the Court did just that in its Order dated February 18, 2021 (docket entry no. 31), granting in part and denying in part the parties' more tailored sealing requests. Similarly, "the mere existence of a confidentiality agreement covering judicial documents is insufficient to overcome the First Amendment presumption of access." Alexandria Real Est. Equities, Inc. v. Fair, No. 11-CV-3694 (LTS), 2011 WL 6015646, at *3 (S.D.N.Y. Nov. 30, 2011). Accord TIG Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 19-CV-10238 (PAE), 2019 WL 6310208, at *4 (S.D.N.Y. Nov. 25, 2019) ("[The parties' confidentiality agreement] does not bind the Court and is, without more, insufficient to overcome the public's countervailing interest in access to the courts.").

Moreover, Cisco's general proffer that it has "an interest in keeping confidential" how it "structures and/or values the sales of assets in a divestiture," because disclosure "would cause competitive harm to Cisco if shared publicly" (Gorman Decl. ¶ 3), is not specifically tailored to the portions of the parties' memoranda that the parties seek to redact—some of which cite to information that has already been made public (see Compl. at ¶¶ 1-52; Reply at 1-10)— and is, without more, insufficient to overcome the countervailing interest in public access. Finally, to the extent the parties have placed limited references to their pre-suit negotiations at issue in connection with the Court's adjudication of Synamedia's motion to dismiss, the Court concludes on the facts of this case that neither Federal Rule of Evidence 408(a) nor the Court's interest in protecting the confidentiality and candor of settlement negotiations outweighs the

public's interest in unredacted versions of the parties' principal memoranda of law.  See Sasson v. Hachette Filipacchi Presse, No. 15-CV-00194 (VM) (SN), 2016 WL 1599492, at *7 (S.D.N.Y. Apr. 20, 2016) (explaining that the public's First Amendment presumption of access may outweigh the general interest in keeping settlement negotiations confidential).[9]

The Court therefore denies Cisco's letter-motion to seal portions of Cisco's opposition memorandum of law (docket entry no. 28), and denies in part Synamedia's letter-motion to seal (docket entry no. 23), to the extent that letter-motion seeks permission to redact Synamedia's opening memorandum of law.

Synamedia's request to file under seal the entire TSA (see docket entry no. 23 at 2-3) is granted in part and denied in part.  As Synamedia notes (id. at 3 n.3), the dispute in this case concerns "the parties' rights and obligations in connection with a single leased property," and not every "other 'transition service' provided by Cisco to Synamedia under the TSA," which governs dozens of other contractual arrangements.  The Court therefore grants Synamedia's request to the extent it seeks to file under seal any portions of the TSA not referenced in (1) either party's briefing in connection with Synamedia's motion to dismiss, or (2) in this Memorandum Order.   The complete, unredacted TSA (attached as Exhibit 1 to the Parrott Declaration, docket entry no. 17) will therefore remain sealed (at the current restricted viewing level) but, as directed in the following paragraph, Synamedia must file a redacted version on the ECF system that reveals the portions of the TSA that are referenced in the parties' motion to dismiss briefing or in this Memorandum Order.

---

[9]   In light of the parties' placement of these pre-suit negotiations at issue on Synamedia's motion to dismiss, the Court will also direct Cisco to re-file a version of its Complaint, with paragraphs 41, 42, 43, 46, and 47 unredacted.  (See docket entry no. 31 at 2 (granting Cisco's application to redact those portions of its Complaint, "without prejudice to reconsideration to the extent the parties place such negotiations [ ] at issue in this case.").)

In light of the Court's resolution of the parties' letter-motions to seal, no later than **September 10, 2021**, Cisco shall file (1) an unredacted copy of its opposition memorandum of law (docket entry no. 30), and (2) a version of its Complaint with paragraphs 41, 42, 43, 46, and 47 unredacted.  By the same date, Synamedia shall file (1) an unredacted copy of its principal memorandum of law (docket entry no. 15), and (2) after having met and conferred with Cisco concerning the appropriate redactions to the TSA in light of this Memorandum Order, an unredacted copy of the Parrott Declaration, redacting only those portions of the TSA which are referenced neither in the parties' briefing nor in this Memorandum Order.

CONCLUSION

For the reasons discussed above, Synamedia's motion to dismiss the Complaint (docket entry no. 13) is denied as to Count I and Count II of the Complaint and granted as to Count III.  Synamedia's letter-motion to seal (docket entry no. 23) is granted in part and denied in part, and Cisco's letter-motion to seal (docket entry no. 28) is denied in its entirety.  The parties must refile the affected pleadings and exhibits as set forth above.

This case remains referred to Magistrate Judge Netburn for general pretrial management.

This Memorandum Order resolves docket entry nos. 13, 23, and 28.

SO ORDERED.

Dated: August 30, 2021
    New York, New York

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge