UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CISCO SYSTEMS, INC.,

                    Plaintiff,

    v.

SYNAMEDIA LTD. F/K/A TRITON UK BIDCO
LIMITED,

                    Defendant,

20-cv-10879 (LTS) (SN)

**ANSWER TO AMENDED
COMPLAINT AND
COUNTERCLAIM**

SYNAMEDIA HOLDINGS LIMITED and SYNAMEDIA
LIMITED,

                    Counterclaim Plaintiffs,

    v.

CISCO SYSTEMS, INC.,

                    Counterclaim Defendant,

      Defendant Synamedia Holdings Limited, which was named in the Amended Complaint

as Synamedia Holdings Ltd. f/k/a Triton UK Bidco Limited, ("Synamedia") and original

defendant Synamedia Limited, which was named in the first Complaint as Synamedia Ltd. f/k/a

Triton UK Bidco Limited ("Synamedia Limited," together with Synamedia, the "Synamedia

Entities" or "Defendants," and each a "Defendant"), by and through their counsel, hereby answer

Plaintiff's Amended Complaint for Damages, Declaratory and Other Relief, and set forth their

affirmative defenses and counterclaim as follows:

1.      This is a breach of contract and declaratory judgment action brought against Synamedia Holdings Ltd. f/k/a Triton UK Bidco Limited ("Synamedia") who is willfully refusing to and has explicitly stated it will not perform and discharge its liabilities and obligations related to a lease as required by the purchase agreement Synamedia entered into with Cisco.  As a result of Synamedia's willful and wrongful conduct, Cisco has already been damaged by millions of dollars which will continue over the remaining lease term.

**ANSWER:** Avers that the allegations contained in paragraph 1 purport to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations contained in paragraph 1.

2.      On April 30, 2018, Cisco and Synamedia entered into a Purchase Agreement in which Cisco, among other things, sold to Synamedia certain contractually defined assets and Synamedia assumed certain contractually defined assumed liabilities.

**ANSWER:**  Denies the allegations contained in paragraph 2, except that Defendant admits that Cisco entered into a Purchase Agreement dated April 30, 2018 with Triton UK Bidco Limited.

3.      These contractually defined assumed liabilities include certain to be assigned contracts. Among those to be assigned contracts is a "Lease by and between Marlin Investments Limited and News International PLC, dated April 15, 2002, as assigned to NDS Limited" (the "Lease") for a property located in the Borough of Eastleigh in Hampshire, England known as Chandlers Ford 2. As a result of subsequent assignments, Eastleigh Borough Council of Eastleigh House is the Landlord and Cisco International Limited, a Cisco subsidiary, and NDS Group Limited, are the Tenants. Cisco International Limited became a Tenant in 2015 from an assignment of one of the then Tenants, NDS Limited, an indirect subsidiary of NDS Group

2

Limited. Synamedia acquired NDS Limited, among other entities, as part of the Purchase Agreement.

**ANSWER:** Aver that the allegations in the first and second sentences of paragraph 3 purport to state legal conclusions as to which no response is required, except that Defendant admits that the quoted language in the second sentence of paragraph 4 appears in Schedule 1.1(c) of the Purchase Agreement and respectfully refers the Court to the Purchase Agreement for its full contents and context. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in contained in third sentence of paragraph 3. Admits the allegations contained in the fourth sentence of paragraph 3.

4.    Under the Lease, Landlord consent is required before the Lease can be formally assigned to (and assumed by) Synamedia or a Synamedia subsidiary.

**ANSWER:** Aver that the allegations contained in paragraph 4 purport to state legal conclusions as to which no response is required.

5.    Under the Purchase Agreement, including as modified by the Second Amendment to the Purchase Agreement ("Second Amendment") (collectively with the Purchase Agreement, the "Purchase Agreement"), Cisco and Synamedia are obligated to use or cause their Subsidiaries to use "commercially reasonable efforts" to obtain the Landlord's consent to a "surrender" and "grant of lease" to Synamedia or a Synamedia subsidiary, or alternatively, an assignment of the Lease to Synamedia or a Synamedia subsidiary.

**ANSWER:** Aver that the allegations contained in paragraph 5 purport to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny that Synamedia Limited had any obligations under the Purchase Agreement.

6.      Pending the formal "surrender" and "grant of lease" or "assignment," Synamedia is required—pursuant to the express terms of the Purchase Agreement—to fully discharge all of Cisco's obligations under the Lease, including, for example, paying rent, insurance, utilities and security. Synamedia and its subsidiaries enjoy a corresponding right to use Chandlers Ford 2 and has used Chandlers Ford 2 for its operations similar to its predecessor, NDS Limited, using Chandlers Ford 2 for its operations.

        **ANSWER:**  Aver that the allegations contained in paragraph 6 purport to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 6, except that Defendants admit that Synamedia Limited (which was formerly known as NDS Limited) formerly had offices located at Chandlers Ford 2.

7.      Cisco has worked well-beyond "commercially reasonable efforts" in excess of 21 months—investing time, project management expertise, subject-matter expertise, and goodwill capital with the Landlord and suppliers and vendors for facilities management—to effectuate a surrender and grant of Lease and later, at the direction of Synamedia, a lease assignment.

        **ANSWER:**  Denies the allegations contained in paragraph 7.

8.      In contrast to Cisco's tireless efforts, Synamedia has engaged in a pattern of delay and bad faith negotiation tactics. For example, notwithstanding Cisco's numerous efforts to facilitate the surrender or grant of lease for Chandlers Ford 2, Synamedia waited six months after the close of the Purchase Agreement to discuss with Cisco the terms of a surrender and grant of lease and then waited another six months to change course and demand that Cisco obtain a lease assignment. More recently, after completing a sublease with Cisco for a nearby property known as

4

Chandlers Ford 1, and without notifying Cisco, Synamedia vacated Chandlers Ford 2 and moved its personnel and equipment from Chandlers Ford 2 into Chandlers Ford 1, and falsely asserted that it had no obligation under the Purchase Agreement to continue to reimburse Cisco for Lease payments and expenses for Chandlers Ford 2 even though it had previously done so since the close of the Purchase Agreement and is expressly required to do so under the Purchase Agreement.

      **ANSWER:**  Denies the allegations contained in paragraph 8, except that Defendants admit that Synamedia Limited vacated Chandlers Ford 2.

      9.     As a result of its deliberate breach of the Purchase Agreement, Synamedia has not paid £1,643,818.84[1] in connection with the Lease broken down as follows (1) £771,164.86 in rent, (2) £5,363.87 in insurance, (3) £132,671.82 in security guard expenses, (4) £73,458.24 in maintenance costs, (5) £86,852.64 for security monitoring cancellation and termination of Chandlers Ford 2 staff after Synamedia moved out of Chandlers Ford 2, (6) £63,986.14 in owed utilities, (7) £1,988.43 in landscaping costs, (8) £237,790.97 in property taxes, (9) £267,479.46 in value-added taxes ("VAT"), and (10) £2,431.02 in miscellaneous costs. Further, in light of Synamedia's assertion that it is no longer obligated to pay rent and expenses under the Lease, and will not pay such rent or expenses, Cisco will be forced to pay millions of dollars over the remaining Lease term (which does not end until June 2026), even though Synamedia is expressly obligated to reimburse Cisco for these expenses under the Purchase Agreement.

---

[1] This is equal to approximately in excess of $2.2 million USD as of the date of the Amended Complaint.

**ANSWER:** Denies the allegations contained in paragraph 9, except that Defendants admit that the Synamedia Entities have not paid the amounts listed in the first sentence of paragraph 9.

10. Cisco seeks damages related to Synamedia's breach of the Purchase Agreement and Synamedia's future, anticipated breaches of the Purchase Agreement in connection with the Lease. Cisco further seeks a declaratory judgment that Synamedia must fully discharge all of its obligations and liabilities in connection with the Lease. The parties have agreed that this dispute is governed by New York law and that any disputes concerning the Purchase Agreement would be heard by a state or federal court located in Manhattan, New York.

**ANSWER:** Avers that the first and second sentences of paragraph 10 purports to describe the nature of the action and remedies sought as to which no response is required. Avers that allegations contained in the final sentence of paragraph 10 purport to state legal conclusions as to which no response is required.

11. Cisco is a California corporation with its principal place of business in San Jose, California. Cisco designs and sells a broad range of technologies that have been powering the Internet since 1984, including, but not limited to, integrating intent-based technologies across networking, security, collaboration, applications and the cloud.

**ANSWER:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11.

12. On information and belief, Triton UK Bidco Limited is a company incorporated under the laws of England and Wales and its principal place of business was originally in London in England. On information and belief, Permira Funds, a private equity firm, had and still has an ownership interest in Triton and its successor. On information and belief, Triton UK Bidco

Limited was renamed Synamedia Holdings Limited. On information and belief, Synamedia

Holdings Limited changed its principal place of business from London in England to Staines-upon-

Thamas in England. On information and belief, Synamedia Holdings Limited acts through various

subsidiaries, including Synamedia Ltd. On information and belief, Synamedia Ltd. is the new name

for NDS Limited. On information and belief, Synamedia is a provider of video solutions to the

video and pay-TV industries.[2]

   **ANSWER:** Admits the allegations contained in the first, third, fifth and sixth

sentences of paragraph 12.  Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations contained in the second sentence of paragraph 12. Admit

that Synamedia Holdings Limited's principal place of business is Staines-upon-Thames in

England.  Admit that Synamedia Limited is a provider of video solutions to the video and pay-

TV industries.

   13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

There is a diversity of citizenship because it is a civil action between a California corporation

(Cisco) and an England and Wales corporation (Synamedia). Further, the amount in controversy

exceeds $75,000.00, exclusive of interest and costs.

   **ANSWER:** Avers that the allegations contained in paragraph 13 purport to state

legal conclusions as to which no response is required.

   14. This Court has personal jurisdiction over the parties because the parties

agreed under the Purchase Agreement to "irrevocably submit to the exclusive jurisdiction of the

---

[2] "Synamedia" shall refer to Synamedia Holdings Limited, individually, or collectively, with
Synamedia, Ltd.

courts of the State of New York and the Federal courts of the United States of America located within the State of New York." Purchase Agreement § 10.10.

   **ANSWER:**  Avers that the allegations contained in paragraph 14 purport to state legal conclusions as to which no response is required, except that Defendants deny that Synamedia Limited is itself a signatory to the Purchase Agreement.

   15. Venue is proper under 28 U.S.C. § 1391 because the parties agreed that "all claims arising out of this [Purchase] Agreement . . . shall be governed by, and construed in accordance with, the internal Laws of the State of New York" and that "venue shall lie solely in Manhattan, New York." Purchase Agreement §§ 10.9, 10.10.

   **ANSWER:**  Avers that the allegations contained in paragraph 15 purport to state legal conclusions as to which no response is required, except that Defendants deny that Synamedia Limited is itself a signatory to the Purchase Agreement.

   16. On April 30, 2018, Cisco and Synamedia entered into the Purchase Agreement. A true and a correct copy of the April 30, 2018 Purchase Agreement is attached as Exhibit A to the Complaint.

   **ANSWER:**  Denies the allegations contained in paragraph 16, except that Defendants admit that Cisco entered into a Purchase Agreement dated April 30, 2018 with Triton UK Bidco Limited that is attached as Exhibit A to the Amended Complaint.

   17. The Purchase Agreement was amended by the First Amendment to the Purchase Agreement (the "First Amendment") on July 3, 2018. None of the amendments to the Purchase Agreement in the First Amendment are relevant to the dispute here. For the sake of completeness, a true and correct copy of the First Amendment is attached as Exhibit **B** to the Complaint.

**ANSWER:** Avers that the allegations contained in paragraph 17 purport to state legal conclusions as to which no response is required.

18.     The parties closed on the Purchase Agreement on October 28, 2018 (the "Closing").

**ANSWER:** Denies the allegations contained in paragraph 16, except that Defendants admit that the transaction contemplated by the Purchase Agreement closed on October 28, 2018.

19.     Under Section 1.1 of the Purchase Agreement, Cisco sold to Synamedia contractually defined Purchased Assets, which included, among others things, "those Contracts listed, or that are categorically described, on Part A of <u>Schedule 1.1(c)</u>." Purchase Agreement § 1.1.

**ANSWER:** Denies the allegations contained in paragraph 19.

20.     Among those Contracts listed on Part A of Schedule 1.1(c) is the Lease for Chandlers Ford 2. NDS Limited, an entity acquired by Synamedia under the Purchase Agreement, utilized Chandlers Ford 2 for its operations and was a Tenant under the Lease. Accordingly, Synamedia, through NDS Limited, was very familiar with the Lease terms and obligations and the Chandlers Ford 2 premises. A true and correct copy of the Disclosure Letter that includes the Schedules and the Lease is attached to the Amended Complaint as Exhibits C and D to the Amended Complaint respectively.

**ANSWER:** Admits that Schedule 1.1(c) of the Purchase Agreement lists the Lease for Chandlers Ford 2. Denies the allegations contained in the second and third sentences of paragraph 20, except that Defendants admit that NDS Limited, an entity that was acquired by

Synamedia Holdings under the Purchase Agreement, was previously a Tenant under the Lease.

Admits the allegations in the final sentence of paragraph 20.

21.      Under the Lease, Tenant is obligated to pay Landlord rent quarterly in advance and other expenses such as insurance. Lease Clauses 2, 7. Tenant's original rent obligation was £127,260 per quarter. Tenant's rent has subsequently increased to £142,016.50 per quarter pursuant to the Rent Review provisions in Clause 7 of the Lease.

**ANSWER:**  Avers that the allegations contained in paragraph 21 purport to state legal conclusions as to which no response is required.

22.      Tenant is also responsible for utilities and taxes. Lease Clause 3.6, 3.8. Further, Cisco has incurred expenses for security, maintenance, landscaping, termination of staff and other costs in connection with Chandlers Ford 2 Lease.

**ANSWER:**  Avers that the allegations contained the first sentence of paragraph 22 purport to state legal conclusions as to which no response is required. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 22.

23.      The Lease requires the Landlord's consent for an assignment of the lease from Cisco to another party such as Synamedia. Lease Schedule 4.

**ANSWER:**  Avers that the allegations contained in paragraph 23 purport to state legal conclusions as to which no response is required.

24.      Section 1.5 of the Purchase Agreement addresses the transfer of Assigned Contracts that require the consent of a third party.

**ANSWER:**  Avers that the allegations contained in paragraph 24 purport to state legal conclusions as to which no response is required.

25.     Under Section 1.5 of the Purchase Agreement, if a to be Assigned Contract requires the consent of a third party to effectuate the transfer, and the consent is not obtained prior to the Closing, such a Contract is considered a "Restricted Asset." Purchase Agreement § 1.5(a).

**ANSWER:** Avers that the allegations contained in paragraph 25 purport to state legal conclusions as to which no response is required.

26.     Section 1.5 of the Purchase Agreement also sets forth the parties' rights, obligations and liabilities in connection with Restricted Assets and the parties' obligations, in part, to obtain the required consent.

**ANSWER:**   Avers that the allegations contained in paragraph 26 purport to state legal conclusions as to which no response is required, except that Defendants deny that Synamedia Limited is itself a signatory to the Purchase Agreement.

27.     Specifically, Section 1.5(b) of the Purchase Agreement states that "each Party shall use, and shall cause their respective Subsidiaries to use commercially reasonable efforts, and shall reasonably cooperate with each other, to obtain or to cause to be obtained any requisite Consent, substitution, or amendment required to Transfer and novate to [Synamedia] all rights and obligations of [Cisco] and its Subsidiaries with respect to the Purchased Assets and the Assumed Liabilities." Section 1.5(b) further provides that "[Synamedia] . . . shall be entitled to exercise all rights and ***be responsible for all obligations with respect to the Purchased Assets and the Assumed Liabilities from and after the Closing Date.*** " Purchase Agreement § 1.5(b) (emphasis added).

**ANSWER:** Avers that the allegations contained in paragraph 27 purport to state legal conclusions as to which no response is required. To the extent a response is required,

Defendants deny the allegations contained in paragraph 27 and deny that Synamedia Limited is itself a signatory to the Purchase Agreement.

28.     Section 1.5(d) of the Purchase Agreement then states:

If any required Consent to Transfer a Restricted Asset . . . is not obtained on or prior to the Closing Date, the Parties hereby agree to use commercially reasonable efforts to implement or give effect to such arrangements (including subleasing, sublicensing or subcontracting) with respect to the underlying rights and obligations, benefits and burdens related thereto, to the extent practicable and/or permitted by applicable Law, for (i) [Synamedia] ... *to perform and be responsible for* (and [Synamedia] . . . shall agree to perform and be responsible for) *the Liabilities of [Cisco]* or any applicable Subsidiary of [Cisco] after the Closing Date thereunder (to the extent they would otherwise constitute Assumed Liabilities had such required Consent been obtained on or prior to the Closing Date), and for *[Synamedia] . to assume the Liabilities thereof* (the "**Subcontracted Restricted Asset Work"),** (ii) [Synamedia] . . . be provided all corresponding rights, benefits and payments thereunder arising or made after the Closing Date . . . in each case until the earlier of (x) such time as such Consent to Transfer the applicable Restricted Asset . . . shall have been obtained and such Transfer shall have taken place and (y) in the case of a Restricted Asset that is a Contract . . . such time as such Contract . . . shall have lapsed, terminated, expired or not have been renewed in accordance with its terms . . . .

Purchase Agreement § 1.5(d) (emphasis added).

**ANSWER:** Avers that the allegations contained in paragraph 28 purport to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations contained in paragraph 28 and deny that Synamedia Limited is itself a signatory to the Purchase Agreement.

29.     Section 1.5(e) of the Purchase Agreement then provides:

[Synamedia] agrees *to perform and discharge, or cause its Subsidiaries to perform and discharge, and shall be responsible for, all Liabilities of [Cisco]* and its Subsidiaries in connection with any . . . Subcontracted Restricted Asset Work . . . and in that regard [Synamedia] will. . . *promptly reimburse the reasonable costs and expenses of [Cisco]* and Affiliates related thereto . . . .

> To the extent that a Consent to Transfer to [Synamedia] . . . with
> respect to a particular Restricted Asset . . . is obtained after the
> Closing Date, the Parties agree that upon the receipt of such
> Consent (I) such assets shall be considered Purchased Assets for all
> purposes of this Agreement and (II) such obligations will no longer
> be considered to be Subcontracted Restricted Asset Work, but will
> instead be deemed to be Assumed Liabilities for all purposes of
> this Agreement.

Purchase Agreement § 1.5(e) (emphasis added).

**ANSWER:**  Avers that the allegations contained in paragraph 29 purport to state

legal conclusions as to which no response is required. To the extent a response is required,

Defendants deny the allegations contained in paragraph 29 and deny that Synamedia Limited is

itself a signatory to the Purchase Agreement.

30.     Finally, Section 1.5(g) states:

> Provided that [Cisco] and its Affiliates comply with their
> respective obligations under Sections 1.5(b)-(e) with regard to
> seeking Consents, the failure to obtain any Consent . . . for the
> Transfer of any Purchased Asset to [Synamedia] . . . of any
> Contract that was intended to be an Assigned Contract . . . or any
> facts, circumstances, effects or consequences resulting from any of
> the foregoing, shall not, individually or in the aggregate, give rise
> to any liability whatsoever of [Cisco] or its Affiliates arising out of
> or relating to such failure . . . .

Purchase Agreement § 1.5(g).

**ANSWER:**  Avers that the allegations contained in paragraph 30 purport to state

legal conclusions as to which no response is required. To the extent a response is required,

Defendants deny the allegations contained in paragraph 30 and deny that Synamedia Limited is

itself a signatory to the Purchase Agreement.

31.     In sum, Section 1.5 makes clear that Synamedia became responsible for all

liabilities and obligations in connection with the Lease at the Closing Date and continues to be

obligated for all liabilities with respect to the Lease to this day and through the end of the Lease.

**ANSWER:**  Denies the allegations contained in paragraph 31.

32.     On the same date of the Closing of the Purchase Agreement, October 28, 2018, the parties entered into the Second Amendment to the Purchase Agreement (the "Second Amendment"). A true and correct copy of the Second Amendment is attached hereto as Exhibit E to the Complaint.

**ANSWER:**  Denies the allegations contained in paragraph 32, except that Defendants admit that Cisco entered into the Second Amendment to the Purchase Agreement on October 28, 2028 with Triton UK Bidco Limited and that a copy of the Second Amendment is attached to the Amended Complaint.

33.     In the Second Amendment, the parties agreed to insert a new Section 5.30 to the Purchase Agreement. In particular, the parties inserted the following provision for Section 5.30(c):

> Each of [Cisco] and [Synamedia] shall, or cause their respective Subsidiaries to, use commercially reasonable efforts acting collaboratively and in good faith to simultaneously:
>
> (i)     complete a surrender to the landlord of Chandlers Ford Lease 1 and Chandlers Ford Lease 2 (as defined in the Disclosure Letter); and
>
> (ii)     arrange for the grant of leases by the landlord of the whole of the property that is (as at the date of this Agreement) demised to [Cisco] or one of its Subsidiaries under the Chandlers Ford Lease 2, and the ground and first floors of the property that is (as at the date of this Agreement) part of the premises demised under the Chandlers Ford Lease 1 (whereby it is agreed that [Cisco] shall use commercially reasonable efforts to work with [Synamedia] to negotiate the grant of such leases which shall have a term of 10 years and contain a tenant only break right on the 5th anniversary of the term commencement date but failing which shall in any event be on no worse terms than Chandlers Ford Lease 1 and Chandlers Ford Lease 2), to NDS Limited,
>
> PROVIDED THAT in the event that (i) and (ii) is not achieved:

(iii)     simultaneously;

(iv)     on terms reasonably acceptable to both [Cisco] and [Synamedia]; and

(v)     within a period of four months following the Closing,

it being agreed that, notwithstanding anything herein to the contrary, the grant of such leases to NDS Limited on materially similar terms and conditions as are contained in Chandlers Ford Lease 1 and Chandlers Ford Lease 2 as at the date hereof, shall be deemed reasonably acceptable terms for the foregoing purpose), then either Party may, by written notice to the other Party, elect that, in lieu of the actions contemplated in clauses (i) and (ii) above, instead:

(vi)     [Cisco] will use commercially reasonable efforts to promptly procure an assignment of the whole of Chandlers Ford Lease 2 (in accordance with its obligations already set out in Section 1.1 and Section 1.5 of the Purchase Agreement) to NDS Limited; and

(vii)     [Cisco] shall use commercially reasonable efforts to grant to [Synamedia] a sub-lease(s) of the ground and first floors of the property known as Chandlers Ford 1 (which comprises part of the property currently demised under the Chandlers Ford Lease 1) to NDS Limited,

in accordance with the terms of the Chandlers Ford Lease 2 and the Chandlers Ford Lease 1, as applicable.

**ANSWER:**  Avers that the allegations contained in paragraph 33 purport to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations contained in paragraph 33 and deny that Synamedia Limited is itself a signatory to the Purchase Agreement.

34.     In short, under the new Section 5.30(c) of the Purchase Agreement, Cisco was agreed to use "commercially reasonable efforts" to arrange for a grant and surrender of lease or alternatively — at the direction of Synamedia — an assignment of the lease.

**ANSWER:** Avers that the allegations contained in paragraph 34 purport to state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny that Synamedia itself is a signatory to the Purchase Agreement or the Second Amendment to the Purchase Agreement.

35.     After the Closing, Synamedia began enjoying the benefits of the Lease by using equipment and personnel (who were formerly NDS Limited personnel) at the Chandlers Ford 2 premises for its operations.

**ANSWER:** Denies the allegations contained in paragraph 35, except that Defendants admit that Synamedia equipment and personnel were previously located at Chandlers Ford 2.

36.     Synamedia — fully aware of its obligations under the Purchase Agreement to perform and discharge its obligations under the Lease as evidenced not only by its use of Chandlers Ford 2 and the Purchase Agreement's plain terms, but also its predecessor NDS Limited being a Tenant to the Lease — began paying Cisco for rent and other expenses in connection with the Lease.

**ANSWER:** Denies the allegations contained in paragraph 36, except that Defendants admit that NDS Limited (now known as Synamedia) was previously a Tenant under the Lease.

37.     Immediately after the Closing, Cisco began working to procure a surrender and grant of lease to Synamedia for Chandlers Ford 2. Cisco reached out to, met and worked with Synamedia for approximately a year concerning a surrender and grant of lease for Synamedia for Chandlers Ford 2.

**ANSWER:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37.

38.     Cisco also arranged meetings between Synamedia and the Landlord to show to the Landlord that Synamedia was a viable tenant for Chandlers Ford 2. The Landlord was made aware of Cisco's sale to Synamedia and Synamedia's occupation of Chandlers Ford 2. At no point did the Landlord claim that Synamedia had no legal right to occupy Chandlers Ford 2.

**ANSWER:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38, except that Defendants admit that Synamedia personnel met with the Landlord from time to time concerning Chandlers Ford 2.

39.     Cisco also introduced Synamedia to Cisco suppliers and vendors for facilities management at Chandlers Ford 2.

**ANSWER:** Admits the allegations contained in paragraph 39.

40.     In contrast to Cisco's prompt and extensive efforts, Synamedia engaged in extensive delay. For example, Synamedia waited until May 2019, more than six months after the Closing, to discuss with Cisco the key and material terms of a new Chandlers Ford 2 lease to present to the Landlord known as Heads of Terms ("HoTs").

**ANSWER:** Denies the allegations contained in paragraph 40.

41.     Despite Synamedia's delays, Cisco worked with Synamedia to reach an agreement on the HoTs and, in an effort to facilitate such an agreement, Cisco even was willing to provide money to the Landlord that the Landlord would then use to pay Synamedia to make repairs to Chandlers Ford 2, including, for example, replacing the air conditioning, painting, refitting the floors and other repairs.

**ANSWER:** Denies the allegations contained in paragraph 41, except that Defendants admit that, from time to time, Synamedia and Cisco discussed various alternatives to address interim dilapidations at Chandlers Ford 2.

42. Cisco and Synamedia reached an agreement on the HoTs and presented them to the Landlord. The Landlord expressed concern regarding the HoTs including, for example, the lease term and Synamedia's right to break the lease. Rather than working to address those concerns, Synamedia decided in November 2019, more than a year after the Closing, to invoke its right to pursue an assignment under Section 5.30(c) of the Purchase Agreement.

**ANSWER:** Admits the allegations contained in the first sentence of paragraph 42. Denies knowledge or information sufficient to form a belief as to the truth of the second sentence of paragraph 42. Denies the allegations contained in the final sentence of paragraph 42.

43. When Synamedia invoked its right to pursue an assignment, Cisco participated in numerous meetings with Synamedia (which, in certain instances, included the Landlord) for nearly a year to secure an assignment. To facilitate Synamedia's agreement to an assignment, Cisco even offered to allow Synamedia to access a fund of £800,000.00 (approximately $1.2 million USD) (rather than having Cisco pay the Landlord and the Landlord pay Synamedia) that Synamedia could use to fund Synamedia's repairs to Chandlers Ford 2 even though Synamedia refused to provide, when requested, evidence of the planned repairs.

**ANSWER:** Denies the allegations contained in paragraph 43, except that Defendants admit that Synamedia and Cisco met several times regarding a potential assignment of the Chandlers Ford 2 Lease and, from time to time, discussed various alternatives to address interim dilapidations at Chandlers Ford 2.

44. Despite Cisco's efforts, Synamedia rejected every proposed assignment.

**ANSWER:** Denies the allegations contained in paragraph 44.

45.     Synamedia's delay tactics then turned into bad faith conduct. Specifically, Synamedia began meeting with the Landlord without Cisco present. Further, on information and belief, in late spring or early summer 2020, Synamedia began planning to move out of Chandlers Ford 2.

**ANSWER:** Denies the allegations contained in paragraph 45, except that Defendants admit that Synamedia has, from time to time, held meeting with the Landlord without Cisco present to help expedite the consent process and admits that, after serving due notice, Synamedia subsequently made plans to and ultimately vacated Chandlers Ford 2 in August 2020.

46.     In July 2020, just days after Cisco and Synamedia completed a sublease for a nearby property known as Chandlers Ford 1, and without notifying Cisco, Synamedia began moving out of Chandlers Ford 2 and moving equipment from Chandlers Ford 2 into Chandlers Ford 1. At the same time Synamedia was moving out of Chandlers Ford 2, it demanded that Cisco obtain an assignment for Chandlers Ford 2 within three weeks with terms that the Landlord had already rejected. On information and belief, Synamedia had no intention of agreeing to such an assignment even if Cisco could obtain an agreement from the Landlord.

**ANSWER:** Denies the allegations contained in paragraph 46, except that Defendants admit that, after the notice period ended with no response from Cisco proposing a viable solution, Synamedia subsequently began vacating Chandlers Ford 2 by moving equipment to a data center and having its staff work from home until suitable office space could be procured.

47.     In addition to demanding an assignment that the Landlord previously rejected and Synamedia had no intention of entering into, Synamedia took the bad faith position, in direct contravention of the plain language of the Purchase Agreement, that once it completely vacated Chandlers Ford 2, it would no longer be liable for any liabilities or obligations in connection with the Lease.

**ANSWER:**  Denies the allegations contained in paragraph 47, except that Defendants admit that Triton notified Cisco that "Cisco ha[d] until July 31, 2020, to promptly meet its obligations under Sections 5.30(c)(vi) of the Second Amendment" and that Cisco's "[f]ailure to do so will be a material breach of the Purchase Agreement and Buyer hereby notifies Cisco that it will cease to have any obligations in respect of the CF Lease, including, but not limited to, an obligation to accept an assignment of the CF Lease or to pay rent for the CF Lease post **July 31, 2020**."

48.     In or around August 2020, Synamedia completed its move out of Chandlers Ford 2.

**ANSWER:**  Admits the allegations in paragraph 48.

49.     In August and September 2020, Cisco business personnel met multiple times with Synamedia business personnel to try to resolve the dispute.

**ANSWER:**  Admits the allegations in paragraph 49.

50.     In further efforts to resolve the dispute without litigation, Cisco in-house counsel met with in-house counsel for Synamedia. Despite these efforts, the parties could not resolve the dispute.

**ANSWER:**  Admits the allegations in paragraph 50.

51.     Since Synamedia has vacated Chandlers Ford 2 in or around August 2020, Cisco has paid £1,643,818.64 in Lease payments and related expenses for Chandlers Ford 2 and Synamedia has not reimbursed Cisco as follows: (1) £771,164.86 for rent from August 23, 2020 through September 2021, (2) £5,363.87 for insurance, (3) £73,458.24 for maintenance expenses, (4) £132,671.82 for security guard expenses, (5) £86,852.64 for security monitoring cancellation and termination of Chandlers Ford 2 staff after Synamedia moved out of Chandlers Ford 2, (6) £63,986.14 for utilities, (7) £1,988.43 in landscaping costs, (8) £690.67 to fix a car park barrier, (9) £668.02 for waste units and snack machines, (10) £237,790.97 in property taxes, (11) £267,479.46 for VAT, and (12) £1,072.33 in other miscellaneous expenses.

**ANSWER:**  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51.

52.     Despite (a) the clear obligation under the Purchase Agreement to perform and discharge its obligations under the Lease, (b) Synamedia predecessor NDS Limited being a Tenant to the Lease and user of the Chandlers Ford 2 premises, and (c) Synamedia's previously performing and discharging its obligations under the Lease pursuant to the Purchase Agreement, Synamedia informed Cisco that it will not reimburse Cisco for these Lease payments and related expenses incurred and going forward.

**ANSWER:**  Denies the allegations contained in paragraph 52, except that Defendants admit that NDS Limited (now known as Synamedia) was previously a Tenant under the Lease and used the Chandlers Ford 2 premises.

53.     Synamedia's refusal to reimburse Cisco is a willful, deliberate and wrongful breach and repudiation of the Purchase Agreement.

**ANSWER:** Denies the allegations contained in paragraph 53.

## COUNT I

54.     Cisco re-alleges and incorporates by reference all allegations set forth in Paragraphs 1 through 53 as if fully set forth herein.

**ANSWER:** Defendant hereby incorporates by reference its responses to all above paragraphs, as if fully set forth herein.

55.     Cisco and Synamedia entered into the Purchase Agreement.

**ANSWER:**  Denies the allegations contained in paragraph 55.

56.     Cisco performed all of its obligations under the Purchase Agreement or was otherwise excused from performing due to Synamedia's conduct.

**ANSWER:**  Denies the allegations contained in paragraph 56.

57.     Synamedia willfully breached the Purchase Agreement by knowingly and deliberately not performing and discharging all of its liabilities and obligations under the Purchase Agreement in connection with the Lease, including, but not limited to, the payment of (1) rent, (2) insurance, (3) security guard expenses, (4) termination of security and building staff fees, (5) maintenance costs, (6) utilities, and (7) taxes.

**ANSWER:**  Denies the allegations contained in paragraph 57.

58.     Cisco suffered damages as a direct and proximate result of Synamedia's willful breach of the Purchase Agreement in the amount to be proven at trial.

**ANSWER:**  Denies the allegations contained in paragraph 58.

## COUNT II

59.     Cisco re-alleges and incorporates by reference all allegations set forth in Paragraphs 1 through 53 as if fully set forth herein.

**ANSWER:**  Defendant hereby incorporates by reference its responses to all

above paragraphs, as if fully set forth herein.

60.     Cisco and Synamedia entered into the Purchase Agreement.

**ANSWER:**  Denies the allegations contained in paragraph 60.

61.     Cisco performed all of its obligations under the Purchase Agreement or was otherwise excused from performing due to Synamedia's conduct.

**ANSWER:**  Denies the allegations contained in paragraph 61.

62.     Synamedia has clearly and positively indicated by words or conduct that it will breach and continue to breach the Purchase Agreement by knowingly and willfully failing and continuing to fail to perform and discharge all of its liabilities and obligations in connection with the Lease.

**ANSWER:**  Denies the allegations contained in paragraph 62.

63.     As a result of Synamedia's knowing and willful anticipatory breach of the Purchase Agreement, Cisco has been harmed in an amount to be proven at trial.

**ANSWER:**  Denies the allegations contained in paragraph 63.

## COUNT III

64.     Cisco re-alleges and incorporates by reference all allegations set forth in Paragraphs 1 through 63 as if fully set forth herein.

**ANSWER:**  Defendant hereby incorporates by reference its responses to all above paragraphs, as if fully set forth herein.

65.     Cisco and Synamedia entered into the Purchase Agreement.

**ANSWER:**  Denies the allegations contained in paragraph 65.

66.     Cisco performed all of its obligations under the Purchase Agreement or was otherwise excused from performing due to Synamedia's conduct.

**ANSWER:**  Denies the allegations contained in paragraph 66.

67.    An actual controversy now exists between Cisco and Synamedia with regards to the Purchase Agreement and whether Synamedia must fully discharge and perform all of Cisco's liabilities and obligations in connection with the Lease. Accordingly, a judicial declaratory is reasonable, necessary, and appropriate in this action to resolve the dispute between Cisco and Synamedia.

**ANSWER:** Avers that the allegations contained in paragraph 67 purport to state legal conclusions as to which no response is required.

68.    Cisco requests a declaratory judgment from this Court that Synamedia is obligated under the Purchase Agreement to fully discharge and perform all of Cisco's liabilities and obligations under the Lease, including, but not limited to reimbursing Cisco for Lease payments and related expenses, until the earlier of the assignment, novation and/or transfer of the Lease to Synamedia with the Landlord's consent or termination of the Lease in accordance with its terms.

**ANSWER:** Avers that the allegations contained in paragraph 68 purport to describe the nature of the action and remedies sought as to which no response is required.

## RESPONSE TO PRAYER FOR RELIEF

Denies that Plaintiff is entitled to the judgment, relief, and/or amounts described in the Prayer for Relief that follows paragraph 68 (and including the allegations comprising Count III of the Amended Complaint which the Court has construed as a request for declaratory relief) and denies any and all remaining allegations in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

Defendants Synamedia and Synamedia Limited assert the following defenses, without assuming the burden of proof on such defenses that would otherwise rest with Plaintiff, and reserve the right to assert other defenses and claims (including, but not limited to, cross-claims and counterclaims) not asserted herein if and when they become appropriate and/or available. Defendants Synamedia and Synamedia Limited incorporate herein all of the factual averments set forth in its Amended Answer.

## FIRST DEFENSE

The Amended Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

The Synamedia Entities are not parties to the Chandlers Ford 2 Lease and have no obligation to pay rent or expenses under the Chandlers Ford 2 Lease.

## THIRD DEFENSE

Because the Chandlers Ford 2 Lease required Landlord consent to assign or transfer Cisco's rights and obligations thereunder (which was never obtained), the Chandlers Ford 2 Lease is not a Purchased Asset, and Cisco's rights and obligations thereunder were not transferred to Triton UK Bidco Limited or any Synamedia affiliate by the Purchase Agreement.

## FOURTH DEFENSE

Because the Landlord's consent to transfer was never obtained and Cisco's rights and obligations under the Chandlers Ford 2 Lease were not transferred to Triton UK Bidco Limited or any Synamedia affiliate by the Purchase Agreement, any obligations Triton UK Bidco or any Synamedia affiliate may have had to reimburse Cisco for Cisco's obligations to pay rent and

expenses under the Lease were defined by the Transition Services Agreement—not the Purchase Agreement—and were terminated by August 2020 at the latest.

## FIFTH DEFENSE

The Synamedia Entities are excused from performance because Cisco materially breached the Purchase Agreement by failing to use, or cause its respective subsidiaries to use, commercially reasonable efforts to obtain or cause to be obtained the requisite consent required to transfer and novate to Triton or NDS Limited all rights and obligations of Cisco and its subsidiaries with respect to the Chandlers Ford 2 Lease.

## SIXTH DEFENSE

The Synamedia Entities are excused from performance because Cisco materially breached the Purchase Agreement and the Second Amendment by failing to use commercially reasonable efforts acting collaboratively and in good faith to simultaneously complete a surrender to the Landlord of the Chandlers Ford 2 Lease and arrange for the grant of lease to Synamedia Limited (which was formerly known as NDS Limited) for the whole of the property that is demised to Cisco or one of its subsidiaries under the Chandlers Ford 2 Lease.

## SEVENTH DEFENSE

The Synamedia Entities are excused from performance because Cisco materially breached the Purchase Agreement and the Second Amendment by failing to use commercially reasonable efforts to work with Triton UK Bidco Limited to negotiate the grant of a lease to Synamedia Limtied (which was formerly known as NDS Limited) for Chandlers Ford 2 which shall have a term of 10 years and containing a tenant only break right on the fifth anniversary of the term commencement date but failing which shall in any event be on no worse terms than the Chandlers Ford 2 Lease.

### EIGHTH DEFENSE

The Synamedia Entities are excused from performance because Cisco materially breached the Purchase Agreement and the Second Amendment by failing to use commercially reasonable efforts to promptly procure an assignment of the whole of Chandlers Ford Lease 2 to Synamedia Limited (which was formerly known as NDS Limited).

### NINTH DEFENSE

Any potential damages award would be limited by the legal duty to mitigate any alleged damages.

### TENTH DEFENSE

On August 30, 2021, this Court dismissed Count III of the Complaint to the extent that it is pled as a standalone declaratory judgment cause of action and construed that cause of action instead as a request for declaratory relief in connection with Counts I and II of the Complaint.  Count III of the Amended Complaint is identical to Count III of the Complaint, therefore Count III of the Amended Complaint must also be construed as a request for declaratory relief in connection with Counts I and II of the Amended Complaint pursuant to the doctrine of collateral estoppel.

### RESPONSE TO DEMAND FOR RELIEF

Deny that Plaintiff is entitled to the judgment, relief, and/or amounts described in the Demand for Relief that follows paragraph 68 and deny any and all remaining allegations in the Demand for Relief.

\*       \*       \*

## COUNTERCLAIM

## NATURE OF THE ACTION

1.      It has been more than three years since Cisco Systems, Inc. ("Cisco") agreed in a purchase agreement with Triton UK Bidco Limited (now known as Synamedia Holdings Limited) ("Triton" or "Synamedia") to use commercially reasonable efforts to transfer Cisco's rights and obligations under a lease for office space located at Chandlers Ford 2 in Eastleigh in the United Kingdom (the "Lease") to Synamedia Limited (together with Synamedia, the "Synamedia Entities").  Rather than work in good faith to obtain the requisite Landlord consent to the transfer, however, Cisco has chosen to violate its own obligations under the Lease and to attempt to retrade on terms agreed to years before.

2.      First, Cisco and Synamedia agreed to seek the Landlord's consent to a surrender of the Lease by Cisco to the Landlord and a regrant of a lease for Chandlers Ford 2 to Synamedia's affiliate, Synamedia Limited (together with Synamedia, the "Synamedia Entities"). But Cisco failed to obtain the requisite Landlord consent to such an arrangement for more than a year.  Moreover, Cisco (which remains the Tenant under the Lease) has allowed the Chandlers Ford 2 premises to fall into a state of disrepair in clear breach of Cisco's repair covenants under the Lease.  Cisco is well aware of the dilapidations at Chandlers Ford 2, having conducted its own external assessment of the premises in December of 2019 and having received from the Landlord an interim schedule of dilapidations listing the needed repairs.  Yet Cisco still has not even *started* the essential works required to render the premises usable for their intended purpose.

3.      Second, Cisco informed the Synamedia Entities out of the blue that it "needed" to seek the regranted lease on a 10-year term with no early termination provision whatsoever.  But

Cisco and Synamedia had already agreed in a contract that any regranted lease would have a tenant-only break as of the fifth anniversary of the commencement of the lease and, in any event, would not be on worse terms than the Lease, which had only 8 years remaining on its term.

4.      Third, Synamedia exercised a contractual right to direct Cisco to seek an assignment of the Lease.  The Lease requires Landlord consent to assign, which may not be unreasonably withheld.  The Lease also provides, however, that Cisco ***must*** agree to guarantee the performance by any assignee of Cisco's obligations in the Lease in such form as the Landlord reasonably requires.  Notwithstanding the plain terms of the Lease, Cisco has refused to provide the requisite guarantee.

5.      These and other commercially unreasonable actions by Cisco have delayed the transfer of Cisco's rights and obligations under the Lease to Synamedia or its affiliate, leaving them over a barrel.  The office space at issue, where Synamedia Limited's employees worked for years, is critical for the Synamedia Entities' continued operations.  While Cisco and Triton had agreed separately that Synamedia Limited could continue to use the Chandlers Ford 2 premises after the closing of the purchase transaction for a fee, Synamedia Limited and its employees have no legal right to occupy those premises vis-à-vis the landlord.  Adding insult to injury, the delay caused by Cisco's unreasonable actions left Synamedia Limited with the choice between vacating the premises or paying surcharges that would have increased Synamedia Limited's costs for the office space by nearly half in perpetuity.  To cut its losses, and as a direct result of Cisco's actions, Synamedia Limited was forced to make the difficult (and costly) decision to vacate Chandlers Ford 2, leaving 300 of Synamedia Limited's employees with nowhere to work.

6.      The Synamedia Entities bring this breach of contract counterclaim seeking damages and declaratory relief to recover for the damages caused by Cisco's breach of its

contractual obligations to use commercially reasonable efforts to transfer the Lease and to clarify

the parties' legal position under the purchase agreement concerning the Lease so that Synamedia

Limited and its 300 employees can get back to work.

## RELEVANT AGREEMENTS

### *The Lease Agreement*

7.        On April 15, 2002, Marlin Investments Limited as "Landlord" and News

International PLC as "Tenant" executed a lease for a property described as "Link Two Link 414

Chestnut Avenue Chandlers Ford Eastleigh" (referred to here as "Chandlers Ford 2") in the

Borough of Eastleigh in Hampshire, England (the "Lease").

8.        After subsequent assignments, the Eastleigh Borough Council of Eastleigh House

became and is currently the "Landlord" under the Lease.

9.        After subsequent assignments, NDS Limited (which was then a subsidiary of

Cisco) became a "Tenant" under the Lease following assignment.  As of January 7, 2015,

however, NDS Limited transferred the whole of its registered title to the Chandlers Ford 2

property (i.e., its interest in the Lease) to Cisco International Limited ("Cisco International"),

which has at all relevant times been an subsidiary of Cisco.[3]  As a result, Cisco (through its

subsidiary Cisco International) is now a "Tenant" under the Lease.

10.        The Lease contains certain "Repair" covenants.  Among other things,

Paragraph 3.9 of the Lease requires the Tenant

> [t]o keep the Premises (including (a) the tiles carpeting and other furnishings of the
> floors of the Building and (b) all boundary walls and structures and (c) the barrier
> at Point Z on the Plan) in good and substantial repair and condition (including
> decorative condition) and so far only as within the meaning of repair and also to
> renew and rebuild the Premises except Insured Damage save where the insurance
> against such Insured Damage is vitiated

---

[3] As set forth further below, NDS Limited was later renamed Synamedia Ltd.

11.     Paragraph 3.10 of the Lease requires the Tenant "[t]o keep the Premises in a clean and tidy condition and clear of all rubbish."

12.     Paragraph 3.11 of the Lease requires the Tenant "[t]o replace any landlord's fixtures in the Premises which are or become beyond repair with other good quality fixtures."

13.     Paragraph 3.12 of the Lease requires the Tenant "[t]o give written notice to the Landlord of any defect or item requiring repair in the Premises which might give rise to a common law or statutory duty on the Landlord in favour of the Tenant or any other person as soon as it comes to the attention of the Tenant or those deriving title under it."

14.     Paragraph 3.13 of the Lease also requires the Tenant "[t]o indemnify the Landlord against any breach of any such duty."

15.     Under Paragraph 3.22 of the Lease, the Tenant must "carry out the repairs decorations and other works required under this Lease in a good and workmanlike manner and to the reasonable satisfaction of the Landlord."

16.     Under Paragraph 3.24 of the Lease, "[a]t the end of the Term," the Tenant must also "deliver the Premises up in repair and in accordance with the Tenant's obligations in this Lease."

17.     As more fully set forth below, Cisco has failed to comply with its ongoing repair obligations under the Lease, including (among many other issues) repairing or replacing fire egress and personnel doors; replacing the building management system; overhauling all opening window casements to ensure correct operation and secure closure; removing and correctly rebuilding defective masonry; and validating water quality and chlorination as well as the performance of common area lighting, primary ventilation services and building elevators.

18.    Cisco is prohibited from assigning its obligations under the Lease or subletting Chandlers Ford 2 to any third party in whole or in part unless certain conditions are met.  Under Paragraph 3.25, the Tenant agreed

> [n]ot to assign underlet hold on trust for another or otherwise part with or share possession or occupation of or suffer any other person to occupy or have an interest in the whole or any part of the Premises save by way of an assignment charge or underletting of the whole of the Premises or an underletting of a Permitted Part or sharing of occupation (in each case) satisfying the relevant requirements of Schedule 4.

19.    Among other requirements, the Tenant agreed in Paragraph 2 of Schedule 4, Part I, that

> [b]efore any assignment of the Premises the assignor shall if reasonably required by the Landlord in writing give a guarantee to the Landlord or the performance by the assignee of the Tenant's obligations in this Lease in such form as the Landlord reasonably requires but in any event containing provisions preventing the guarantee from being vitiated by:
>
> 2.1    any neglect or forbearance of the Landlord.
>
> 2.2    any time or indulgence given by the Landlord.
>
> 2.3    any variation of this Lease or the variation of or entry into any other contract by the Landlord and the Tenant and
>
> 2.4    the release of any security or guarantee held in relation to such obligations

20.    In other words, under the plain terms of the Lease, the Landlord may reasonably require Cisco to provide an "authorised guarantee agreement" or "AGA"—which in turn requires Cisco to guarantee the Lease obligations of the assignee—before consenting to any proposed assignment of the Lease.[4]  As Cisco would have been advised when originally entering into the Lease, provisions requiring AGAs in connection with an assignment are market standard in all

---

[4] The term "authorised guarantee agreement" or "AGA" has a meaning defined by the law of the United Kingdom. Specifically, as set forth in Paragraph 1.3 of the Lease, "[t]he expressions … 'authorised guarantee agreement' … have in relation to this Lease the meanings specified in Section[] … 16 … of the Landlord and Tenant (Covenants) Act 1995."

English commercial leases.  Thus, Cisco knew at all relevant times that it could be reasonably

required to provide an AGA—and thus remain on the hook for Lease obligations even after

assignment—before the Landlord would consent to assignment of the Lease to any third party,

including Synamedia.  Refusing to provide an AGA where reasonably required by the Landlord

under UK law is not commercially reasonable.

21.     In Paragraph 6.1 of Schedule 4, Part II, the Tenant agreed that

> [a]ny underlease of the Premises shall be granted on the same terms as this Lease
> … modified to the same effect as the alienation covenants to be given to the
> Landlord pursuant to paragraph 5 subject in the case of an underlease of part of the
> Premises to such further modifications as the Landlord approves (such approval not
> to be unreasonably withheld or delayed).

22.     Pursuant to Paragraph 6.9 of the Lease, "[i]t is not intended that any term of this

Lease is enforceable by a third party under Section I of the Contract (Rights of Third Parties)

Act 1999."

23.     The Term of the Lease is 25 years beginning from June 24, 2001, subject to

certain termination provisions in the Lease.  Thus, the Lease expires by its terms in June of 2026.

24.     Since at least 2016, however, Cisco (through its subsidiary the Tenant) has also

had unilateral termination rights.  Under Paragraph 6.10 of the Lease,

> [t]he Tenant may determine this Lease on the date of expiration of the fifteenth of
> this [the "Determination Date"] having given notice in writing to that effect to the
> Landlord by not later than the date which is nine months prior to the Determination
> Date (as to which time shall be of the essence hereof) and if the Tenant serves such
> notice then upon the expiry of the notice this Lease shall cease and absolutely
> determine but without prejudice to any right or remedy of the Landlord in respect
> of any antecedent breach of covenant by the Tenant ….

25.     Upon information and belief, Cisco and Cisco International have not exercised the

Tenant's right to terminate the Lease, which remains in full force and effect.

26.     Upon information and belief, as of the date of the filing of this Counterclaim

Complaint, Cisco International has not assigned, sublet, transferred or conveyed its rights and

obligations under the Lease to any third party, including the Synamedia Entities, and thus remains bound by its obligations under the Lease.

### *The Purchase Agreement*

27.     On April 30, 2018, Cisco entered into a Purchase Agreement with Triton UK Bidco Limited through which funds advised and / or managed by subsidiary entities of the private equity firm Permira Holdings Limited ("Permira") acquired Cisco's Service Provider Video Software Solutions ("SPVSS") group.

28.     Triton was subsequently renamed Synamedia Holdings Limited.  Synamedia has no employees and operates through its subsidiaries, including Synamedia Limited.

29.     Cisco prohibited employees of its SPVSS group from taking part in the negotiation of the Purchase Agreement and other transaction documents.  Instead, such negotiated were conducted by and among Cisco and Permira.

30.     Pursuant to the Purchase Agreement, Cisco agreed to "sell, assign, transfer, convey and deliver to" Triton certain contractually defined "Purchased Assets," including, among other things:

>    (c)     (i) subject to Section 1.5, the rights of Seller or any of its Subsidiaries under (A) those Contracts listed, or that are categorically described, on Part A of Schedule 1.1(c) of the Disclosure Letter or (B), subject to Section 1.2(g) and Section 5.21, all Contracts pursuant to which a Purchased Entity or any of its Subsidiaries is a party, in each case as such Contracts may be renewed or modified following the Agreement Date in accordance with Section 5.1(a) (collectively, the "***Assigned Contracts***"); and (ii) rights under any of the Contracts that are Restricted Assets or Restricted Split Interests, in each case, in accordance with Section 1.5 … ;

>    (g)     (i) the rights of Seller or any of its Subsidiaries under those sublease agreements, lease agreements, executive suite agreements, or other similar agreements (collectively, the "***Business Leases***", and which Business Leases shall constitute Assigned Contracts hereunder) pursuant to which Seller or any of the Other Sellers leases the real properties listed on Schedule 1.1(g)(i) of the Disclosure Letter (the "***Assigned Leased Properties***"); and (ii) any Business Leases to which a Purchased Entity is a party, including the leases listed on Schedule 1.1(g)(ii)

(collectively, the real property identified in the forgoing clauses (i)-(ii), together with the real property that is the subject of the Real Property Agreement, the "***Business Real Property***");

31.     The Lease described above is among the enumerated "Assigned Contracts" in Schedule 1.1(c) and "Assigned Leased Properties" in Schedule 1.1(g)(i) that the parties sought to transfer to Triton as a "Purchased Asset" under the Purchase Agreement.

32.     NDS Limited (which is now known as Synamedia Limited) is among the enumerated "Purchased Entities" in Schedule 1.1(a) that the parties did transfer to Synamedia under the Purchase Agreement.

33.     The Purchase Agreement does not, however, purport to transfer to Synamedia any assets for which third party consent is required, but has not been obtained by the closing date on October 28, 2018 (the "Closing Date").  Rather, Section 1.5(a) of the Purchase Agreement provides that:

> [n]otwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to sell, convey, transfer, assign or deliver (a "***Transfer***") to [Triton] any Contract constituting an Assigned Contract, or any claim, right or benefit arising under or resulting from such Assigned Contract if and for so long as (i) the Transfer or attempted Transfer to Buyer thereof, without the Consent of a third party, under applicable Law or the express terms of the applicable Assigned Contract, would constitute a breach of or other contravention of the rights under such Assigned Contract and (ii) the Consent for such Transfer is not obtained prior to the Closing (such Contract, together with any claim, right or benefit arising thereunder, being collectively referred to herein as "***Restricted Assets***").

34.     Section 1.5(a) also provides that

> ***[n]otwithstanding anything in this Agreement to the contrary, unless and until any such Consent with respect to any Restricted Asset … is obtained or the applicable restriction or impediment on Transfer … ceases to exist (such time, the "Consent Receipt Time"), neither such Restricted Asset nor such Restricted Split Interest shall constitute a Purchased Asset***; provided that at no time on or after the Closing shall any Restricted Assets … for which the Consent Receipt Time has not occurred constitute Excluded Assets nor shall any Liability arising out of, or related to, such Restricted Assets … constitute an Excluded Liability solely by virtue of being a Restricted Asset …, in each case, for purposes of Seller's indemnification obligations under ARTICLE VIII.  Once Consent to Transfer a

Restricted Asset … is obtained, Seller shall, or shall cause its Subsidiaries to Transfer the relevant Restricted Asset … to which such Consent relates to Buyer for no additional consideration. . .

(emphasis added).

35.    For Restricted Assets, Cisco and Triton agreed instead that,

[i]f any required Consent to Transfer a Restricted Asset … is not obtained on or prior to the Closing Date, ***the Parties hereby agree to use commercially reasonable efforts to implement or give effect to such arrangements (including subleasing, sublicensing or subcontracting) with respect to the underlying rights and obligations, benefits and burdens related thereto, to the extent practicable and/or permitted by applicable Law***, for (i) Buyer or other Buyer, as the case may be, to perform and be responsible for (and Buyer or other Buyer, as the case may be, shall agree to perform and be responsible for) the Liabilities of Seller or any applicable Subsidiary of Seller after the Closing Date thereunder (to the extent they would otherwise constitute Assumed Liabilities had such required Consent been obtained on or prior to the Closing Date), and for Buyer or other Buyer, as the case may be, to assume the Liabilities thereof (the "***Subcontracted Restricted Asset Work***"), (ii) Buyer or other Buyer, as the case may be, to be provided all corresponding rights, benefits and payments thereunder arising or made after the Closing Date, and (iii) Seller to enforce at the Buyer's or other Buyer's, as the case may be, sole cost and expense and at the reasonable request of and for the benefit of Buyer or other Buyer, as the case may be, any and all claims, rights and benefits of Seller and/or any applicable Affiliate of Seller, to the extent related to the Subcontracted Restricted Asset Work, against any third party thereto arising from any such Restricted Asset or Restricted Split Interest, in each case until the earlier of (x) such time as such Consent to Transfer the applicable Restricted Asset … shall have been obtained and such Transfer shall have taken place and (y) in the case of a Restricted Asset that is a Contract …, such time as such Contract … shall have lapsed, terminated, expired or not have been renewed in accordance with its terms.

(first emphasis added).

36.    As explained above, Cisco must obtain the Landlord's consent before the Tenant may transfer its rights and obligations as to Chandlers Ford 2.  Cisco did not obtain the Landlord's consent to transfer its rights and obligations as to Chandlers Ford 2 to Synamedia or Synamedia Limited before the Closing Date.  In fact, as of the date of filing this Counterclaim Complaint, Cisco still has not obtained the Landlord's consent to either assign the Lease or

sublease Chandlers Ford 2.  As a result, the Lease is a Restricted Asset and, under the plain terms of the Purchase Agreement, is not a Purchased Asset.

37.     Pursuant Section 10.6 of the Purchase Agreement, Cisco and Synamedia agreed in relevant part that

> This Agreement shall not be assigned by either Party without the prior written consent of the other Party, and any attempted assignment, without such consent, shall be null and void.  ***Notwithstanding the foregoing, without the consent of [Cisco], [Triton] may assign its rights and obligations to any Affiliate of [Triton]*** (including of the right to purchase the Purchased Assets or Purchased Shares to any Other Buyer); <u>provided</u>, however, that no such assignment shall limit or affect the obligations of Buyer hereunder and Buyer shall continue to remain liable for the performance of its obligations hereunder notwithstanding such assignment.  ***Subject to the foregoing, this Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and permitted assigns.***

38.     Cisco and Synamedia further agreed that "[n]othing in this Agreement, express or implied, is intended to confer upon any Person other than Buyer, Seller or their successors or permitted assigns, any rights or remedies under or by reason of this Agreement," subject to certain exceptions not applicable here relating to Debt Financing Sources and Business Indemnitees.

39.     Synamedia is a party to the Purchase Agreement.  As an affiliate of Synamedia, Synamedia Limited is a "permitted assign" for purposes of Section 10.6.  Both Synamedia and Synamedia Limited may enforce the Purchase Agreement.

### *The Transition Services Agreement*

40.     On October 28, 2018, Cisco and Synamedia also executed a Transition Services Agreement or "TSA."  Under the TSA, "[t]he Party or any of its Affiliates, as applicable, providing the Transition Services shall be referred to as '***Service Provider***' and the Party or any of its Affiliates, as applicable, receiving the Transition Services from Service Provider shall be referred to as '***Service Recipient***'."

41.     Under Section 1.1(a) of the TSA, Service Provider (which includes Cisco and Cisco International) agreed to provide Service Recipient (which includes Synamedia and Synamedia Limited) with certain "Transition Services" described in exhibits to the TSA, including internet, security, and "physical access and exclusive use of" the Chandlers Ford 2 property.

42.     Under Section 3.1 of the TSA, Cisco and Synamedia agreed in relevant part that, "[f]or each Transition Service, Service Recipient will pay to Service Provider the fees set forth in Exhibit A (to the extent that Service Provider is Seller or an Affiliate thereof) … calculated and charged on the basis of Service Provider's Fully Loaded Cost as expressed in the applicable fee schedule and any applicable Surcharge."

43.     "Fully Loaded Cost" is defined in the TSA as the

Service Provider's (i) pass-through costs (which will be calculated and charged to Service Recipient at Service Provider's actual cost); (ii) direct costs in respect of (A) personnel costs (contractor rates and in the case of employees, salary, fringe benefits and bonuses), which will be charged at Service Provider's estimated actual cost plus an overhead charge of 5% percent, and (B) Service Provider's historically allocated direct costs plus an overhead charge of 5% percent.

44.     The Service Recipient must also

pay to Service Provider, as applicable, any actual incremental costs or fees, calculated on the basis of Service Provider's Fully Loaded Cost (which will be determined in a manner consistent with the methodology used to calculate fees for such Transition Service), incurred by Service Provider in connection with providing a Transition Service that directly result from (i) a change in Service Recipient's business operations, infrastructure or conduct of business that causes Service Provider to perform a Transition Service at degrees or levels in excess of applicable Service Levels or in a manner or volumes materially different from the performance of such services during the applicable Baseline Period, to the extent the parties have not agreed to such changes pursuant to the first sentence of Section 2.1(c), or (ii) the L&T Integration.

45.     Cisco and Synamedia agreed that amounts owed for Transition Services—which include "physical access and exclusive use of" Chandlers Ford 2—would be invoiced and paid pursuant to the TSA.  Specifically, Section 3.2 of the TSA provides in relevant part that

> All fees and other amounts owing by Service Recipient for Transition Services hereunder shall be payable on a monthly basis within 30 days following receipt of Service Provider's invoice for Transition Services completed during the applicable Seller fiscal month.  Each billing invoice shall set forth in reasonable detail the applicable Transition Service provided during such period and the corresponding amounts owed for each of the Transition Services ….   Service Recipient may withhold payment of any amount disputed in good faith until such time as the dispute has been resolved in Service Provider's favor ….

46.     Under Section 3.3 of the TSA, the rights and obligations as to any Transition Services do not extend beyond the expiration of the applicable Transition Period,

> except (a) where Service Recipient reasonably expects that it cannot migrate from the Transition Service prior to the expiration of the Transition Period and Service Recipient provides Service Provider notice of its election of an additional three month period for the provision of such Transition Services (such period, an "***Extension Period***") and (b) as required by Section 1.5(e), of the Purchase Agreement.

47.     In the event of any such extension of the TSA, "Service Recipient agrees to pay Service Provider a surcharge, for any Extension Period, in addition to the fees set forth in the applicable Exhibit for the Transition Service (the '***Surcharge***')."  The amount of the Surcharge increases over time.  Specifically, "[t]he Surcharge shall be equal to 35% of the fees for the applicable Transition Service during the initial three month period of any such extension and 45% of the fees for any extension granted thereafter."

48.     Section 3.3 of the TSA further provides that "to the extent that a failure by Service Provider to comply with its obligations under this Agreement directly causes a delay that prevents Service Recipient's migration from the applicable Transition Service within the established Transition Period, the Transition Period shall be tolled to account for the delay and no Surcharge shall be payable during such tolling period."  Moreover, "[f]or clarity, no

Surcharge is payable to the extent a Transition Period for is required to be extended by Section 1.5(e) of the Purchase Agreement."

49.     Pursuant to Schedule 3: Facilities of the TSA, "[f]ees for facilities transitioning to Service Recipient"—which was intended to include Chandlers Ford 2—"shall be charged to Service recipient based on actual cash expenditures made for lease payments plus an allocated cost per square foot for Employee Services in accordance with Exhibit C."

50.     Schedule 3 also sets the applicable expiration period for the rights and obligations under the TSA as to Chandlers Ford 2.   In particular, Schedule 3 provides that the applicable Transition Period for "all other Specified Premises"—which includes Chandlers Ford 2—is 18 months.  Schedule 3 further provides that the Facilities Services—including physical access to Chandlers Ford 2—would only be in effect "until the applicable lease transitions to the Service Recipient" and that "[n]otwithstanding the Transition Period, including any extension permitted under Section 3.3 of the Agreement, the License term with respect to any of the transitioning site shall not exceed the term of the current lease term."

51.     The TSA also gave the Service Recipient—i.e., Synamedia and Synamedia Limited—the express and unqualified contractual right to "terminate or reduce its requirement for any or all Transition Service(s), or portion thereof"—which includes physical access to Chandlers Ford 2—"upon 30 days' written notice to Service Provider."

52.     After the Closing Date, Cisco International provided the Synamedia Entities with billing invoices for "Facilities expenses for Chandlers Ford 2" pursuant to the TSA.  Synamedia Limited paid each invoice in full, including any applicable surcharges, for the duration of the Transition Period as extended by and among the parties (as described further below).

*The Second Amendment to the Purchase Agreement*

53.     Also effective as of the Closing Date on October 28, 2018, Cisco and Triton

entered into a second amendment to the Purchase Agreement (the "Second Amendment") that

specifically addressed the parties' rights and obligations as to the Chandlers Ford 2 property.

54.     Among other things, Section 5.30(c) of the Purchase Agreement as amended by

the Second Amendment provides that Cisco and Synamedia

> shall, or shall cause their respective Subsidiaries to, use commercially reasonable
> efforts acting collaboratively and in good faith to simultaneously: (i) complete a
> surrender to the landlord of … Chandlers Ford Lease 2 … ; and (ii) arrange for
> the grant of leases by the landlord of the whole of the property that is (as at the date of
> this Agreement) demised to Seller or one of its Subsidiaries under the Chandlers
> Ford Lease 2, … (whereby it is agreed that Seller shall use commercially reasonable
> efforts to work with Buyer to negotiate the grant of such leases which shall have a
> term of 10 years and contain a tenant only break right on the 5th anniversary of the
> term commencement date but failing which shall in any event be on no worse terms
> than … Chandlers Ford Lease 2), to NDS Limited …."

55.     Cisco and Synamedia also agreed on an alternative course of action in the event

that (i) and (ii) above were not achieved "(iii) simultaneously; (iv) on terms reasonably

acceptable to both Seller and Buyer[5]; and (v) within a period of four months following the

Closing,"—i.e., by February 28, 2019.  In that case,

> either Party may, by written notice to the other Party, elect that, in lieu of the actions
> contemplated in clauses (i) and (ii) above, instead:
>
> (vi) Seller will use commercially reasonable efforts to promptly procure an
> assignment of the whole of Chandlers Ford Lease 2 (in accordance with its
> obligations already set out in Section 1.1 and Section 1.5 of the Purchase
> Agreement) to NDS Limited …

56.     As explained above, under the terms of the Lease, Cisco had to obtain the

Landlord's consent to any assignment, and the Landlord had the right to reasonably require

---

[5] Cisco and Triton agreed that, tor the foregoing purpose, "notwithstanding anything herein to the contrary, the grant
of such leases to NDS Limited on materially similar terms and conditions as are contained in … Chandlers Ford
Lease 2 as at the date hereof, shall be deemed reasonably acceptable terms[.]"

Cisco to provide an AGA before consenting to any assignment.  This AGA requirement is market standard in English commercial real estate leases, and, in any event, Cisco was well aware of the terms of the Lease when it executed the Second Amendment.

## FACTUAL BACKGROUND

### *NDS Limited Is Spun Out from Cisco and Opens for Business as Synamedia*

57.     As of the Closing Date, Cisco's SPVSS group was spun off, and NDS Limited was transferred from Cisco to Triton pursuant to the Transaction Documents.  As a blog post by a Cisco Senior Vice President and General Manager explained on May 1, 2018, "[f]ollowing the close of the transaction, the Permira Funds will ***create a new, rebranded company*** focused on developing and delivering video solutions for the Pay-TV industry."[6]  In the months that followed, NDS Limited was rebranded and renamed as Synamedia Limited, and Triton was renamed Synamedia Holdings Limited.

58.     Following the spinoff, Cisco and the Synamedia Entities formed a joint steering committee comprising executives from both companies to, among other things, manage the winding down of services provides under the TSA and to address any issues (the "Steering Committee").  The Steering Committee is managed by Cisco.

### *Absent a Formal Transfer of the Lease, Synamedia Remains at the Mercy of Cisco's Landlord*

59.     In addition to changing parent companies, the legal effect of the spinoff also had implications for Synamedia Limited's use of the office space at Chandlers Ford 2:  because the "new, rebranded" Synamedia Limited was longer an affiliate of Cisco or the Tenant, Synamedia Limited no longer had any legal right to occupy Chandlers Ford 2 vis-à-vis the Landlord unless and until Cisco actually transferred its rights and obligations under the Lease.

---

[6] https://blogs.cisco.com/news/service-provider-news (emphasis added).

60.     Indeed, following the announcement of the purchase transaction, another landlord *did* evict the new Synamedia Limited and its employees from office space located in Lindon, Utah.

61.     Synamedia Limited's precarious position presented critical challenges for the new company.  Many of the employees from Cisco's SPVSS group who were now with Synamedia Limited had worked at Chandlers Ford 2 for years.  Critical servers and other equipment and infrastructure necessary for Synamedia Limited's business were also already in place at Chandlers Ford 2.  Yet, as of the Closing Date, Synamedia Limited's continued use of this space was at the mercy of the Landlord—against which the third-party Synamedia Limited had no legal recourse under the Lease—unless and until Cisco obtained Landlord consent to and actually completed the transfer of Cisco's rights and obligations under the Lease.  This gave the Synamedia Entities every incentive to work with Cisco in good faith (which the Synamedia Entities did) so that Cisco could complete the transfer of the Lease contemplated by the Purchase Agreement as quickly as possible (which Cisco did not).

### *Cisco Breaches the Lease by Allowing Chandlers Ford 2 to Fall into Disrepair*

62.     It soon became clear that Cisco had allowed the Chandlers Ford 2 premises to fall into disrepair in violation of Cisco's repair obligations under the Lease.  An external assessment conducted on behalf of Cisco in December 2019 identified numerous areas of Chandlers Ford 2 that required cleaning, repair or wholesale replacement, including (among many other things) the entire building management system; fire egress and personnel doors; all opening window casements; defective masonry; common area lighting; primary ventilation services and the building elevators.  The report also detailed issues with water services and quality that were expected to require a minimum of cleaning and chemical treatment.

63.     According to Cisco, the estimated cost to remediate the then-existing dilapidation at Chandlers Ford 2 would be £800,000 GBP (or approximately $1.1 million USD using today's exchange rate).  An external assessment conducted on behalf of the Synamedia Entities at or around that time yielded an ***even higher*** estimated cost.

64.     Upon information and belief, the Landlord has served Cisco with an interim schedule of dilapidations, which under UK law details the items that need to be repaired in a property by a tenant who is liable for such repairs under the terms of a lease.

65.     Despite Cisco's repair obligations and its actual knowledge of needed repair work, Cisco has yet to even start the repairs.

66.     Unsurprisingly, the condition of Chandlers Ford 2 has only continued to deteriorate over time.  By February 2020, the Synamedia Entities informed Cisco that the air conditioning system, boilers and the overall building management system—each of which is necessary to support a habitable work environment—were not working.  Moreover, the building's elevators were overdue for necessary repair and maintenance as well as the legally required Lifting Operations and Lifting Equipment Regulations ("LOLER") inspection.  The exterior of the building had also continued to deteriorate over this time, now requiring full investigation and repair.  As demonstrated by Cisco's own external assessment, Cisco has been actually aware of some or all of these critical issues for nearly two years and has done nothing.

67.     Upon information and belief, as a direct result of Cisco's delay in performing essential work on Chandlers Ford 2, the total estimated cost of the essential repair work has more than doubled since Cisco's external assessment in December of 2019.

68.     Cisco's continued refusal to act upon the interim schedule of dilapidations served on Cisco by the Landlord constitutes a material breach of Cisco's repair covenants under the

Lease.  This willful and ongoing violation of the at-issue Lease is plainly incompatible with Cisco's obligation to "use ***commercially reasonable*** efforts acting ***collaboratively*** and ***in good faith***" to secure the Landlord's consent to a surrender and regrant or an assignment of the Lease as to Chandlers Ford 2 under Section 5.30 of the Purchase Agreement as amended by the Second Amendment.

### *Cisco Never Completed the Requisite Transfer of the Lease to Triton or Synamedia*

69.     As explained above, the Lease was among the Assigned Contracts and Assigned Leased Property the rights and obligations of which Cisco was supposed to transfer to Triton under the Transaction Documents.  But Cisco failed to obtained the Landlord's consent to transfer Cisco's rights and obligations under the Lease prior to the Closing Date.  As a result, the Lease became a Restricted Asset—not a Purchased Asset—as of the Closing Date, and Cisco's rights and obligations under the Lease were ***not*** transferred to Triton at closing.

70.     Nor has Cisco ever obtained the Landlord's consent to such transfer in the nearly three full years since the Closing Date.  Specifically, and notwithstanding the Synamedia Entities' willingness to agree several different forms of transfer, Cisco has failed to obtain the Landlord's consent to (i) a surrender of the Lease by Cisco and a regrant of a lease for Chandlers Ford 2 to either of the Synamedia Entities; (ii) an assignment of the Lease to either of the Synamedia Entities; and (iii) a sublease of Chandlers Ford 2 to either of the Synamedia Entities.

### *Cisco Attempts to Retrade on Lease Terms Already Agreed to in the Second Amendment*

71.     As reflected in the Second Amendment, the parties agreed that a surrender of the Lease by Cisco and a re-grant of a lease for Chandlers Ford 2 to Synamedia Limited was the preferred method to effect the transfer of Cisco's rights and obligations under the Lease.  But the

four-month time period provided under the Second Amendment expired in February of 2019 without Cisco having secured the Landlord's consent.

72.     In April 2019, a representative of Cisco informed a representative of Synamedia Limited that Cisco suddenly "need[ed]" a 10-year term "without break"—i.e., without any kind of early termination provision.  This represented a clear departure from the lease terms Cisco had already agreed to seek in the Second Amendment—namely, a 10-year term with a "tenant only break right on the 5th anniversary of the term commencement" or (failing that) the same 8-year term remaining on the current Lease.  Unfortunately for the Synamedia Entities, this was not the last time Cisco would try to retrade on its prior agreements to their detriment.

73.     Negotiations stalled shortly thereafter, and the Synamedia Entities heard nothing but radio silence for months.  In November 2019, after more than a year had passed since the Closing Date without any actual transfer of the Lease, Synamedia determined to exercise its contractual right under Section 5.30 of the Purchase Agreement as amended by the Second Amendment to have Cisco seek an *assignment* rather than the preferred surrender and re-grant.

74.     Even so, upon information and belief, months passed before Cisco reached out to the Landlord regarding an assignment—and still more months passed before Cisco and the Landlord would actually meet to discuss.

### *Cisco Unreasonably Refuses to Provide an AGA as Required under the Lease*

75.     Cisco failed to use commercially reasonable efforts to secure Landlord consent to assign the Lease.  Cisco knew at the time it entered into the Purchase Agreement and the Second Amendment that the Landlord could reasonably require Cisco to guarantee the Lease obligations of Synamedia or Synamedia Limited going forward as a condition precedent to consenting to any assignment of the Lease to either.  Cisco also would have known that AGA requirements are

market standard in UK commercial leases, and that the Landlord was under no obligation to release Cisco from Cisco's own Lease obligations.  Cisco has not identified any basis to believe that the Landlord's requirement that Cisco provide an AGA prior to assignment was unreasonable.  Cisco's refusal to provide an AGA where reasonably required by the Landlord under UK law is commercially unreasonable.

76.     By 2020, however, Cisco demonstrated that it had no intention of complying with its Lease obligation to provide an AGA.  Upon information and belief, in January 2020, Cisco finally instructed its representative to approach the Landlord regarding an assignment, but conditioned upon Cisco being released from providing an AGA.

77.     Meanwhile, the Synamedia Entities were prepared to agree to an assignment that included Synamedia Limited taking on Cisco's liability for then-existing dilapidations at Chandlers Ford 2 (plus additional work on the air conditioning system above and beyond Cisco's repairing liability) subject to Cisco's payment of an agreed amount for the existing dilapidations.

78.     In an effort to expedite the assignment process, and after notifying the Steering Committee (which is managed by Cisco), the Synamedia Entities conferred with the Landlord regarding, among other things, Synamedia Limited's plans for the building.

79.     Upon information and belief, on or around March of 2020, the Landlord informed Cisco that it was willing to consent to an assignment of Cisco's rights and obligations under the Lease to Synamedia Limited on the same terms as the Lease provided that Cisco agreed to provide an AGA as required under the Lease.  The Landlord also indicated at that time that it may be willing to release any AGA given by Cisco in the future upon completion of the essential works by Cisco.

80.     Despite Cisco's clear contractual obligations under the Lease to provide an AGA in connection with the requested assignment, Cisco refused, and the Landlord declined to consent to any assignment.  Cisco's refusal to provide the requisite AGA is commercially unreasonable and constitutes a breach of Cisco's obligation under Section 5.30 of the Purchase Agreement as amended by the Second Amendment "to use commercially reasonable efforts to promptly procure an assignment of the whole of Chandlers Ford Lease 2 … to NDS Limited[.]"

81.     Cisco's Head of Real Estate - EMEAR also told Synamedia in March 2019 that "[w]ith regard to the assignment, the key factor for the Council is getting the building 'in repair'."

### Cisco Charges Synamedia Limited Surcharges under the TSA Despite Having Caused the Delay

82.     As explained above, the initial Transition Period of 18 months defined in the TSA as to Chandlers Ford 2 expired in April 2020, and Cisco still had not obtained the Landlord's consent to any form of transfer of Cisco's rights and obligations under the Lease.

83.     Adding insult to injury, Cisco then began charging the Synamedia Entities surcharges under the TSA for its continued use of Chandlers Ford 2.  Specifically, and as explained above, the surcharges under the TSA increased Synamedia Limited's cost to continue using the Chandlers Ford 2 facilities by *more than a third* through July 2020.  After July 2020, any subsequent extension of the TSA came with an even higher surcharge, increasing Synamedia Limited's costs for Chandlers Ford 2 by *nearly half*.

84.     Facing sky-high costs with no end in sight for the use of premises that the Synamedia Entities *still* had no legal right to occupy, the Synamedia Entities offered to extend the TSA and pay surcharges under protest and subject to two additional conditions intended to keep negotiations moving apace and avoid being further penalized for Cisco's delay.  On

March 23, 2020, the Synamedia Entities asked to extend the TSA until May 30, 2020 provided that (i) the parties agreed to turn drafts of legal documents promptly and (ii) "[i]f additional delays are caused outside of Synamedia control (ie due to additional Cisco discussions with the LL regarding the AGA or otherwise once the HOTs are agreed), then Cisco will remove the TSA surcharge for those additional delays caused." Within mere hours, Cisco rejected these conditions.

85.     In response to Cisco's refusal, Synamedia Limited explained that "[w]e cannot extend the TSA with an uplift (indefinitely) if Cisco legal do not commit to commercially reasonable timeframes for drafting, as this is outside Synamedia's control." Once again, however, the Synamedia Entities were rebuffed.

86.     Even though Cisco's failure to procure consent to the assignment was a direct cause of any subsequent extension of the TSA as to Chandlers Ford 2, Synamedia Limited paid all of the surcharges Cisco charged to the Synamedia Entities under the TSA for as long as Synamedia Limited occupied Chandlers Ford 2.

87.     But, rather than continue to pay 45% surcharges in perpetuity on top of the regular fees owed under the TSA, the Synamedia Entities determined to exercise the bargained-for right to terminate the TSA as to Chandlers Ford 2 and have Synamedia Limited vacate the premises.

88.     On July 10, 2020, Triton's counsel at Fried, Frank, Harris, Shriver & Jacobson LLP informed Cisco's counsel that Cisco had "until **July 31, 2020**, to promptly meet its obligations under Sections 5.30(c)(vi) of the Second Amendment," which meant "that Cisco must have procured an 'as is' assignment of the Lease dated April 15, 2002, from the Landlord,"

with none of the conditions Cisco had proposed be attached to the assignment "(e.g., Schedule of Essential Repair precondition or third party guarantor)."[7]

89.     Triton's counsel further stated that Cisco's failure to procure the as-is assignment of the Lease before July 31, 2020—nearly two years after Closing and into the second TSA extension period which carried a surcharge of 45%—"will be a material breach of the Purchase Agreement and [Triton] hereby notifies Cisco that it will cease to have any obligations in respect of the CF Lease, including, but not limited to, an obligation to accept an assignment of the CF Lease or to pay rent for the CF Lease post **July 31, 2020**."

90.     Cisco did not object to Triton's termination letter verbally or in writing.

91.     Instead, Cisco personnel assisted Synamedia Limited by serving as project managers for Synamedia Limited's exit from Chandlers Ford 2.  With Cisco's help, Synamedia Limited vacated Chandlers Ford 2 as of August 21, 2020.

92.     In August and September 2020, business personnel and in-house counsel from Cisco and the Synamedia Entities met multiple times to try to resolve the dispute as to Chandlers Ford 2, but were unable to do so.

### *Synamedia Sustained Damages as a Result of Cisco's Conduct*

93.     Vacating Chandlers Ford 2 and rehousing Synamedia Limited's servers, among other things, redirected valuable resources from Synamedia Limited's business operations and cost the Synamedia Entities considerable time and money.

94.     Synamedia Limited's employees are eager to return to the office after such an extended time working from home, but (because of Cisco's actions described herein) the

---

[7] In that same letter, Triton accepted Cisco's dilapidations settlement offer of £800,000, which Triton proposed to use "to restore the building at any time of [Triton's] choosing with no new restrictions imposed by either Cisco or the Landlord."

Synamedia Entities do not currently have any office space to which they can return.  The lack of an office space has in turn caused low morale among the Synamedia Limited's employees as well as concerns over job security—both of which directly impact the Synamedia Entities' overall business and productivity.  Furthermore, unless Synamedia Limited is able to procure office space in the very near future, critical Synamedia Limited employees may decide to leave Synamedia Limited to the detriment of the Synamedia Entities' ongoing business operations.  As a result, the Synamedia Entities must currently redirect time and resources that otherwise would be devoted to their primary business operations to searching for suitable replacement office space and to addressing employee concerns.  Cisco's unreasonable actions have caused injury to the Synamedia Entities' ongoing business operations in an amount to be determined at trial.

95.      Moreover, the Synamedia Entities have no guarantee as to when Cisco will start—let alone complete—the essential works required to render Chandlers Ford 2 usable for its intended purpose.  Thus, even if Cisco were able to obtain Landlord consent to an assignment or sublease now after nearly three years of delay, Synamedia Limited's employees would still be in limbo until the premises could be repaired and fitted out for Synamedia Limited's use.

## COUNTERCLAIM
### *Breach of Contract*

96.      The Synamedia Entities repeat and reallege each and every allegation contained above as if set fully set forth herein.

97.      Cisco and Synamedia are parties to the Purchase Agreement as amended, and Cisco breached contractual obligations thereunder that inure to the benefit of and are enforceable by the Synamedia Entities, which caused damages to the Synamedia Entities in an amount to be determined at trial.

98.     Cisco and Triton are parties to various Transaction Documents—including the Purchase Agreement, the Second Amendment, and the Transition Services Agreement—through which Cisco's SPVSS group was spun off into a separate company unaffiliated with Cisco.

99.     Pursuant to the Purchase Agreement, NDS Limited (now known as Synamedia Limited) was one of the Purchased Assets that was transferred from Cisco to Triton (now known as Synamedia Holdings Limited).

100.    The rights, remedies and obligations in the Purchase Agreement inure to the benefit of and are enforceable by the parties to the Purchase Agreement, including Synamedia, as well as their permitted assigns, which include Synamedia Limited.

101.    Cisco is a Tenant under the Lease.

102.    The Purchase Agreement as amended also contemplated the transfer of Cisco's rights and obligations under the Lease to Triton (n/k/a Synamedia Holdings Limited) or Synamedia Limited (f/k/a NDS Limited).

103.    Under the Purchase Agreement as amended by the Second Amendment, Cisco was obligated to use commercially reasonable efforts acting collaboratively and in good faith to arrange for a surrender of the Lease to the Landlord and the grant of a new lease for Chandlers Ford 2 to NDS Limited (now known as Synamedia Limited) within a four months of the Closing Date.

104.    Cisco breached the Purchase Agreement by, among other things, failing to use commercially reasonable efforts acting collaboratively and in good faith to arrange for a surrender of the Lease to the Landlord and the grant of a new lease for Chandlers Ford 2 to NDS Limited (now known as Synamedia Limited) before the end of the specified time period.

105.     Under the Purchase Agreement as amended by the Second Amendment, Cisco agreed with Triton to seek a new lease for a term of 10 years and containing a tenant only break right on the 5th anniversary of the term commencement date or in any event on no worse terms than the existing Lease.

106.     Cisco's attempt after the Closing Date to seek worse and different lease terms than those Cisco and Triton already agreed to in the Second Amendment was willful, not in good faith, and not commercially reasonable.

107.     Under the Purchase Agreement as amended by the Second Amendment, upon written notice by either party, Cisco was obligated to use commercially reasonable efforts to promptly procure an assignment of the whole of Chandlers Ford Lease 2 to NDS Limited (now known as Synamedia Limited).

108.     The Synamedia Entities notified Cisco in writing that Cisco must seek an assignment.

109.     Cisco breached the Purchase Agreement by, among other things, failing to use commercially reasonable efforts to promptly procure an assignment of the whole of the Lease to NDS Limited (now known as Synamedia Limited).

110.     Cisco's continued refusal to provide an AGA, which the Landlord may reasonably require under the terms of the Lease before consenting to an assignment, is willful, not in good faith, and not commercially reasonable.

111.     Cisco's ongoing violation of the repair covenants contained in the Lease by allowing Chandlers Ford 2 to fall into disrepair and refusing to commence essential works despite having conducted its own external assessment of the dilapidations at Chandlers Ford 2

and having been served with a schedule of interim dilapidations by the Landlord is willful, not in good faith, and not commercially reasonable.

112.    Cisco knowingly charged the Synamedia Entities surcharges for extensions of the TSA that were only necessary because Cisco had failed to use commercially reasonable efforts to transfer the Lease to the Synamedia Entities as required under the Purchase Agreement as amended by the Second Amendment within the Transition Period.

113.    Synamedia expects that discovery will reveal other ways in which Cisco breached contractual obligations that inure to the benefit of and are enforceable by the Synamedia Entities, and the Synamedia Entities reserves their rights to amend this Counterclaims complaint to add additional bases for their counterclaim.

114.    As a direct result of these and other failures by Cisco to use commercially reasonable efforts to transfer the Lease to the Synamedia Entities, the Synamedia Entities have been injured and have sustained damages in an amount to be determined at trial.

115.    The Synamedia Entities are entitled to an award of damages in an amount to be determined at trial.

116.    The Synamedia Entities are entitled to a declaratory judgment that Cisco breached the Purchase Agreement as amended by the Second Amendment by failing to use commercially reasonable efforts acting collaboratively and in good faith to arrange for a surrender and regrant of the lease for Chandlers Ford 2 to one of the Synamedia Entities.

117.    The Synamedia Entities are entitled to a declaratory judgment that Cisco breached the Purchase Agreement as amended by the Second Amendment by failing to use commercially reasonably efforts to negotiate the grant of a lease to one of the Synamedia Entities for Chandlers Ford 2 which shall have a term of 10 years and containing a tenant only break right on the 5th

anniversary of the term commencement date but failing which shall in any event be on no worse terms than the Chandlers Ford 2 Lease.

118.   The Synamedia Entities are entitled to a declaratory judgment that Cisco breached the Purchase Agreement as amended by the Second Amendment by failing to use commercially reasonable efforts to promptly procure an assignment of the whole of the Lease to one of the Synamedia Entities.

**WHEREFORE,** having fully answered the allegations in the Amended Complaint and asserted a Counterclaim, the Synamedia Entities respectfully request that this Court enter judgment:

1.   Denying the claims for relief asserted by Plaintiff against Synamedia Holdings Limited and Synamedia Ltd. in the Amended Complaint and dismissing the Amended Complaint, with prejudice;

2.   Declaring that Cisco failed to use commercially reasonably efforts acting collaboratively and in good faith to simultaneously complete a surrender to the Landlord of the Chandlers Ford 2 Lease and arrange for the grant of lease to one of the Synamedia Entities for the whole of the property that is demised to Cisco or one of its subsidiaries under the Chandlers Ford 2 Lease;

3.   Declaring that Cisco failed to use commercially reasonably efforts to negotiate the grant of a lease to one of the Synamedia Entities for Chandlers Ford 2 which shall have a term of 10 years and containing a tenant only break right on the 5th anniversary of the term commencement date but failing which shall in any event be on no worse terms than the Chandlers Ford 2 Lease;

4.  Declaring that Cisco failed to use commercially reasonably efforts to promptly procure an assignment of the whole of Chandlers Ford Lease 2 to one of the Synamedia Entities;

5.  Granting the Synamedia Entities damages from Cisco's breaches of the Purchase Agreement as amended in an amount to be determined at trial;

6.  Granting the Synamedia Entities all equitable or other relief against Plaintiff as a consequence of defending this action including reasonable attorneys' fees and costs if warranted; and

7.  Granting the Synamedia Entities such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
    December 14, 2021

            FRIED, FRANK, HARRIS, SHRIVER
             & JACOBSON LLP

            By:    */s/ Matthew D. Parrott*
                 Matthew D. Parrott
                 Rebecca L. Martin

            One New York Plaza
            New York, New York 10004-1980
            (212) 859-8000
            M.Parrott@friedfrank.com
            rebecca.martin@friedfrank.com

            *Counsel for Defendants and Counterclaim*
             *Plaintiffs Synamedia Holdings Limited named*
             *herein as Synamedia Holdings Ltd. f/k/a*
             *Triton UK Bidco Limited and Synamedia*
             *Limited named in the original complaint as*
             *Synamedia Ltd. f/k/a Triton UK Bidco Limited*